THE CHESAPEAKE AND POTOMAC TELEPHONE COMPANY AND THE CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF BALTIMORE CITY vs. THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*Appeal From Order Refusing an Injunction—Legislative Ratification of Municipal Contract—Injunction to Protect Rights Acquired Under an Ordinance—Ordinance Granting to Telephone Company Right to Construct Conduits Under Streets—Contract Between Company and Municipality—Repeal of Ordinance.*

Under Code, Art. 5, sec. 29, an appeal lies from an order refusing to grant an injunction *ex parte* upon plaintiff's bill and exhibits, before answer filed or appearance of defendant.

When a contract by a municipal corporation is *ultra vires*, it becomes valid when subsequently confirmed by the Legislature, if the contract is one which the Legislature might have originally authorized.

An injunction will be granted to protect and secure the enjoyment of rights acquired under a lawful municipal ordinance.

When a municipal ordinance gives to a Telephone Company the right to construct conduits under the streets of the city upon certain conditions, which conditions have been performed, and when the ordinance has been ratified by the Legislature, it cannot be rescinded by the municipality so as to destroy the rights of the company thereby acquired.

An ordinance of Baltimore City (No. 41 of 1889), authorized the Chesapeake and Potomac Telephone Company to construct conduits under the surface of the streets of said city in which to place their wires, provided that three miles of such conduits should be constructed within two years from the passage of the ordinance, and that after said two years and as rapidly as the wires should be laid in the conduits, all poles of the company along such streets should be removed.   It was also ordained that, in consideration of the grant of these rights, the company should execute an agreement to pay to the city a designated annual sum per lineal yard of conduits, and file with the City Commissioner a plan showing the location of all con-duits proposed to be constructed, which construction should be under the supervision of the City Commissioner, and that the company should provide in the conduits space for the wires of the Fire Alarm and Police Departments, free of cost, and should execute a bond conditioned for the performance of the requirements of the or-dinance.   The Act of 1892, ch. 200, authorized the Mayor and City Council to construct underground conduits for wires, but provided that the Act should not be deemed to modify the above-mentioned ordinance or the rights and privileges granted thereby.   The Act of 1898, ch. 123, being the new charter of the city, while empowering the city to regulate the use of all streets and to construct conduits and to require telegraph and telephone wires to be placed underground, also provided that "nothing herein contained should be deemed or taken to modify or change in any manner the provisions of Ordinance No. 41."   An ordinance passed in 1892 provided that no person or corporation should dig up any of the streets of the city without a written permit from the City Commissioner and the Mayor. In April, 1899, an ordinance was passed repealing Ordinance No. 41, which authorized the C. & P. Tel. Co. to lay conduits in future, but reserving its rights as to existing conduits.   The company filed a bill alleging that it had complied with all the conditions of Ordinance No. 41 and constructed certain conduits ; that in April, 1899, it desired to make additional conduits in certain streets and filed plans of the location with the City Commissioner and applied for a written permit to make the same, which was refused ; that the com-

pany was willing to construct the conduits under the supervision of the City Commissioner. The prayer of the bill was for injunction restraining the Mayor and the Marshal of Police from interfering with the making of the conduits upon the streets named. From an order refusing to grant the injunction before appearance or answer of the defendants, the company appealed. *Held,*

1st. That a valid contract was created by the passage of Ordinance No. 41 and its acceptance by the company ; that such contract cannot be rescinded by the Mayor and City Council, unless required by the public health, safety or convenience, and that there is nothing in the case as now presented to show that the repeal of the ordinance was justified by any such considerations.

2nd. That the Acts of 1892, ch. 200, and 1898, ch. 123, are legislative ratification and confirmation of that contract, and that these Acts also operate as a legislative grant for the future of the rights and privileges thus ratified and as a legislative prohibition against any interference therewith by the city.

3rd. That the ordinance of April, 1899, is ineffectual, upon the case as stated in the bill, to destroy or modify the privileges granted by Ordinance No. 41.

4th. That the question whether the rights so granted can lawfully be repealed by the Legislature is a matter not now before the Court.

5th. That injunction is the proper remedy to enforce the rights of the appellant company.

6th. That the cause should be remanded to the Court below, without affirming or reversing the order appealed from, in order to give the defendant an opportunity to answer and for a hearing on the merits.

Appeal from an order of the Circuit Court of Baltimore City (WICKES, J.) The complete text of ordinance No. 41 is as follows :

### No. 41.

An ordinance to provide for laying the wires of The Chesapeake and Potomac Telephone Company of Baltimore City, or of The Chesapeake and Potomac Telephone Company, or of both of said companies, in underground conduits in the city of Baltimore.

Whereas, it has been made known to the Mayor and City Council of Baltimore, that The Chesapeake and Potomac Telephone Company of Baltimore City, and The Chesapeake and Potomac Telephone Company, have entered upon the occupation of a new building, at the corner

of St. Paul street and Bank lane, in the city of Baltimore, intended to be used in part as a Telephone Exchange ; and

Whereas, such Telephone Exchange will, in said location, necessarily require, if the overhead system of wires is wholly continued, a large and increasing number of such overhead wires along the length of the streets and other public ways leading to said building ; and

Whereas, such concentration of overhead wires at a point so central as the location of said building is not desirable, and it would be to the public advantage that such wires should be laid as far as practicable in cables underground ; therefore,

Section 1. Be it enacted and ordained by the Mayor and City Council of Baltimore, That the said The Chesapeake and Potomac Telephone Company of Baltimore City, and the said The Chesapeake and Potomac Telephone Company, acting separately or in conjunction, be and they are hereby respectively authorized to lay their or their respective telephone wires intended to be used in connection with the Telephone Exchange to be established in the building belonging to the Chesapeake and Potomac Telephone Company, at the corner of St. Paul street and Bank lane, in the city of Baltimore, in cables, laid in suitable conduits under the surface of the streets, alleys or highways in said city now traversed, or to be so traversed by their said respective wires, with the necessary man-holes for affording access to said cables.    Such conduits and man-holes shall be constructed in such manner as not to injure any vault, sewer, water-pipe or gas-pipe, and such conduits and man-holes shall be constructed by either or both of said companies as parts of one system at their, or their respective cost and expense, and said companies so acting separately or jointly in constructing said system of underground wires shall have power to make the necessary house connections in localities where the same may be required, in such manner as may be best adapted to the location by means of any wire or wires from such cable or cables ; provided, how-

ever, that the said two companies, if acting together, shall have and possess the powers and privileges only which might have been exercised by one of said companies if acting alone under this ordinance.

Section 2. And be it further enacted and ordained, that nothing contained in this ordinance shall be construed to grant unto either, or both of said Telephone Companies the exclusive right to lay underground wire cables within the limits of the city of Baltimore, and that the rights granted by this ordinance shall cease and determine, unless three miles of the underground conduits provided for by this ordinance are constructed within two years from the date of its approval, and after said two years, and as rapidly as said conduits may be constructed and said cables are laid therein, all poles belonging to or under the control of either of said companies, standing upon any street or thoroughfare in this city, along which any such conduit is constructed and cable laid, shall be removed, and shall not be replaced, except in so far as such existing pole or poles now standing, or hereafter to be maintained or erected by such companies or company,. are necessary to be maintained or erected by them, or it, for the purpose of making distribution of and forming connections with any wire or wires forming part or parts of any such cable so laid in a conduit with the building or buildings, or place or places intended to be connected with such wire or wires from such cable.

Section 3. And be it further enacted and ordained, that the companies in this ordinance, hereinbefore referred to, shall, in consideration of the rights and privileges granted to them by this ordinance, before constructing any portion of the conduit or conduits hereinbefore authorized, enter into an agreement in a form to be approved by the Mayor of the city of Baltimore, and with sufficient security, certified by the Comptroller and approved by the Mayor, to pay annually to the Mayor and City Council of Baltimore thirty cents for each lineal yard of the first four miles in aggregate lineal length of conduit or conduits, constructed under the

provisions of this ordinance, and twenty cents per lineal yard for each succeeding mile or fraction of a mile of the aggregate lineal length of such conduit or conduits exceeding such aggregate lineal length of four miles ; provided, however, that the annual payment so to be made in any year, accounting from the date of the approval of this ordinance, shall not be less than the sum of three thousand dollars, and shall also, before constructing any portion of such conduit or conduits, file with the City Commissioner a plan showing the location and character of the portion or portions of the conduit or conduits next proposed to be constructed, and every such conduit or part thereof shall be constructed under the supervision of the City Commissioner, and all paving which may be temporarily removed by the companies or company, hereinbefore mentioned in this ordinance, in the course of the construction of any conduit or conduits authorized by this ordinance, shall be restored or replaced under the direction and superintendence of the City Commissioner, by the companies or company constructing said conduit or conduits, and at their or its expense, in a manner satisfactory to said Commissioner.

Section 4. And be it further enacted or ordained, that in every underground conduit constructed under the provisions of this ordinance space shall be provided, if required, free of cost or rent, for the laying therein by the Fire Commissioners of the city of Baltimore, of a cable for the exclusive use only of the police and fire alarm telegraph and police patrol wires.

Section 5. And be it further enacted and ordained, that the company or companies, hereinbefore referred to in this ordinance, which shall propose to exercise any privileges under this ordinance, shall, before exercising the same, enter into a bond in the sum of ten thousand dollars, with good and sufficient securities, to be approved by the Mayor and Comptroller, conditioned that the company or companies hereinbefore in this ordinance mentioned, exercising the privileges granted by this ordinance, will faithfully per-

form the obligations imposed upon it or them respectively thereby.

Approved May 9th, 1889.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PEARCE and SCHMUCKER, JJ.

*Arthur W. Machen* and *Bernard Carter*, for the appellants.

There can be no reasonable doubt that by the Ordinance No. 41 of 1889, the Mayor and City Council of Baltimore granted to the Telephone Companies named, the right to lay in underground conduits all the wires to be used in connection with the Telephone Exchange mentioned in the ordinance, that is to say, not only all the wires at that time in use, but all such wires *as in the future, and without limit as to time,* would be needed by the companies for use in connection with said exchange, and the grant was made of the right to use for said conduits all such streets, alleys and highways as would be *reasonably needed* for such conduits.

The rights granted by the ordinance to the companies were not granted as gratuities, but were granted upon valuable considerations moving from the companies to the Mayor and City Council of Baltimore. These considerations were: 1. The obligation to pay to the Mayor and City Council of Baltimore, year by year and forever, an annual payment of a sum of money for every lineal yard of conduits constructed in the streets or alleys of the city of Baltimore, under the provisions of the ordinance. 2. The obligation to furnish, free of cost for the construction thereof, and free of rental for the permanent use thereof, of space in every conduit constructed under the grant made by the ordinance, for the wires of the Police and Fire Alarm Telegraph and Police and Patrol wires.

3. That the companies would, from time to time, as the conduits were constructed in the streets and alleys of the city, *remove from* said streets and alleys all their poles except such as were necessary for the purpose of making distribution of, and forming connections from said underground

cables to buildings intended to be connected with the tele-
phone wires ; *and at least three miles of said underground
conduits* should be built within two years from the passage
of the ordinance.

The Mayor and City Council having, in and by said
ordinance, entered into a valid contract with the Telephone
Companies therein named, upon valuable considerations,
whereby there was granted and secured to said companies,
upon the terms set forth in said ordinance, the right to place
in conduits constructed by them in the streets and alleys of
the city of Baltimore, the telephone wires which, from time
to time, their business would require to be constructed for
use in connection with the Telephone Exchange mentioned
in said ordinance, and for this purpose to use all such
streets and alleys of the city of Baltimore, as are reasonably
necessary for this purpose ; and the Telephone Companies,
upon the passage of said ordinance, having accepted its
provisions and complied with all the stipulations and con-
ditions on their part to be performed, as therein set forth ;
and having, upon the faith of the contract embodied and
expressed in said ordinance, and in reliance upon the rights
and privileges thereby granted, proceeded to construct con-
duits as therein provided, in the manner therein provided,
and constructed more than the three miles mentioned in
said ordinance within the two years therein mentioned, it is
not within the power of the Mayor and City Council of Bal-
timore to impair said contract by withdrawing the rights
and privileges granted by said ordinance to said companies.

The passage of the Ordinance No. 41, and all its provis-
ions, and the rights and privileges thereby granted to the
Telephone Companies, having been ratified by the Legisla-
ture of Maryland by the Act of 1892, chapter 200, and
again by the new charter, all of the provisions thereof, and
the rights and privileges thereby granted, and the contract
thereby made between the Mayor and City Council of Bal-
timore and the Telephone Companies, are of the same
validity as if an express legislative authority had been

granted *previously* to the passage of the ordinance, to the Mayor and City Council of Baltimore by the Legislature to grant the same and make the contract. *O'Brian* v. *County Comr's.*, 50 Md. 24; *Cooley Const. Lim.*, 379; *Chicago* v. *Sheldon*, 9 Wall. 56; *Pompton* v. *Cooper Union*, 101 U. S. 202; *Lake Roland Co.* v. *Baltimore*, 77 Md. 376; *Baltimore* v. *Balto. Traction Co.*, 166 U. S. 681.

If, therefore, the contract entered into between the Mayor and City Council of Baltimore by the passage and acceptance of the Ordinance No. 41 of 1889, and performance of its conditions on the part of the companies, is, by its nature, an irrevocable contract, then the Mayor and City Council of Baltimore, having been directly authorized to enter into it by virtue of the ratification by the Legislature of its *very express terms and provisions*, it is beyond annulment or impairment by the Mayor and City Council of Baltimore. That it is such a contract we submit is fully established by the decisions of the Supreme Court of the United States, and of State Courts cited by that Court, as well as of other Courts. We refer to the following : *Walla Walla* v. *Walla Walla Water Company*, 176 U. S. 1, 13 to 18; *New York* v. *Squire*, 125 U. S. 175, 190; *St. Louis* v. *W. Union Tel. Co.*, 148 U. S. 103; *City W. Co.* v. *Bridgeport P. H. Co.*, 55 Conn. 1; *Coast L. Co.* v. *Mayor, etc., of Sav.*, 30 Fed. Rep. 646; *Hobelman* v. *Railroad Co.*, 79 Mo. 632, 642; *N. O.* v. *St. L. Church*, 11 La. Ann. 244; *McGee* v. *City of San Jose*, 68 Cal. 91.

The right of the appellants under the ordinance of 1889 to construct conduits in the streets is as wide as the city, exercisable as circumstances *may from time to time give occasion for its exercise.* This intention is manifest on the face of the ordinance. The telephone system of the appellants is one and entire; to arrest and prevent the extension of their conduits in the city is as much a breach of the contract, and a destruction of the right under it, as a requirement that they should cease to use conduits already constructed would be.

· We have, from the face of the Act of Assembly of 1892, chapter 200, shown, as we believe, that the intention of the Legislature in its passage was to take out of the hands of the city the power, if any before it had, to deprive the appellants of the rights and privileges granted by the Ordinance No. 41, and secured to them by the contract therein made on valuable consideration, and that this was done in legal effect by a ratification of the said contract and a consequent regrant of the said rights and privileges. We submit that this construction of the effect of said Act of Assembly is fully borne out by the principles which have received the sanction of this Court. *Balt. and Pot. R. R. Co.* v. *Reaney*, 42 Md. 130, 131; *Basshor* v. *Dressel*, 34 Md. 511; *Koch* v. *N. A. R. Co.*, 75 Md. 226.

*John V. L. Findlay, City Counsellor*, for the appellees. ·

It is the law of this State, too well established to be shaken, that a legislative Act in the exercise of a political power conferred for the common weal, and in the exercise of which the sovereignty of the State is simply made operative by the agency of one of its political divisions, cannot be placed beyond the power of repeal. As tersely stated by JUDGE MARTIN, whose opinion was adopted by this Court in *State* v. *Graves*, 19 Md. 351, ''it is clear that the Mayor and City Council has no power by *any contract* or covenant or by any ordinance, by law or resolution, to *restrain* or *abridge* its own legislative powers.''

'In the case of *Rittenhouse* v. *The Mayor, &c.*, 25 Md. 336, this Court drew a clear and well defined distinction between contracts made by a municipal corporation in the character of a *property holder*, and those which arise out of the powers entrusted to it for *public* purposes.'' 77 Md. 370. It is for this reason that the property held by the city for public purposes cannot be taken in execution to satisfy a judgment, and many other illustrations of the same kind might be given. *Darling* v. *M. & C. C.*, 51 Md. 1; *Bailey* v. *Mayor of N. Y.*, 3 Hill, 531; *Presbyterian Church*

v. *The Mayor, &c.*, 5 Cowan, 538; *Western Saving Fund Society* v. *Philadelphia*, 31 Pa. 175; *Newton* v. *Commissioners*, 100 U. S. 548.

Usually where a contract not contrary to public policy has been entered into between parties competent to contract, it is not within the power of either to withdraw without the consent of the other, but when the parties are not private persons, dealing in matters and things in which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes, other principles apply. *C. B. & Q. R. C.* v. *Omaha*, 170 U. S. 70–73; *Illinois C. R. R.* v. *Illinois*, 146 U. S. 387.

In this last case the Supreme Court held that the Legislature could not *give* away nor *sell* the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances, and that there could be *no irrepealable contract* in a conveyance of property by a grantor in disregard of a *public trust*.

It will be conceded, I suppose, that the power of the city over its streets is a public power; certainly none could be more so, and that therefore the doctrine of the above cases applies with full force. *American Rapid Telegraph Co.* v. *Hiss*, 125 N. Y. 641. This power over the streets is sometimes classified with the police power, and, if it properly belongs in this class, it has been held by the Supreme Court that a *State* cannot limit its exercise of this power by contract or in any other way. *Stone* v. *Mississippi*, 101 U. S. 814; *Boston Beer Co.* v. *Massachusetts*, 97 U. S. 25, 659; *C. B. & Q.* v. *Omaha*, before cited, 170 U. S.

JUDGE ALVEY, in the separate concurring opinion which he filed in the case of the *L. R. E. R. W. Co.* v. *The City*, says that the power to maintain and regulate the use of the streets of the city is a *trust*, for the benefit of the *general public*—77 Md., page 384—and although he was speaking in a case which concerned the surface of the streets, there can be no difference, where the sub-surface is affected, as

will appear further on by the express terms of the city charter. He also treats the grant of the privilege of the streets to the Railway Company in that case as a *license*, and says that in any proper case indemnity as money could be made for any injury caused the licensee by the revocation of the license.

So here, if the city had interfered with the use and enjoyment of any of the existing conduits laid down by the company, it would have been a proper case for indemnity, but the company is in the full enjoyment of its subway as it has existed since 1890, and was also permitted to fill out the trench it dug in 1898. Nothing has been taken away from it. No additional burden has been imposed upon it. It pays annually twenty cents and thirty cents a yard rental, and no more, and which by the way does not *equal* the annual charges made for telephone service against the city. Nor can the company complain on the ground that it had spent a large sum of money in constructing its subway. It gets rid of a considerable pole tax by the removal of the wires underground and has managed to worry along for nine years without any perceptible diminution of income, or any marked improvement in service, but whether this is so or not, it was bound to know that by *implication* the law against the abridgement of any public legislative power is *transferred to and becomes a part of every charter or franchise granted.* *Booth St. Ry. Law*, section 8, page 9 ; *Railroad Co.* v. *Richmond*, 96 U. S. 521.

The time may come when, a hundred years from now or sooner, when the whole plan of urban rapid transit, telephone communication and lighting may have to be reconsidered and changed, in which the absolute and unrestricted control of the public highways will play an important part, and what a commentary would it be upon our lack of foresight and regard for the interests of those who come after us, if this company could block the way by insisting that in 1889 the Mayor and City Council of Baltimore had conferred upon it an inextinguishable right in all of the public streets

to be exercised at such times as it was ready and saw fit. It makes no difference how much the city may grow or how far it may extend, all of its highways, present and prospective, are mortgaged in perpetuity to this company in consideration of which the city is to receive the munificent sum of twenty cents a yard for conduit laid, not quite equal to what the company takes out of the public treasury in payment of its own charges against the city.

The language of the proviso in the Act of 1892, ch. 200, and in the charter, is in these words ; " Provided,·however, that nothing contained in this article shall be deemed or taken to modify or change in any manner the provisions of Ordinance number forty-one, approved May 9, 1889, or the rights and privileges granted thereby to the companies therein named, or either of them ;" and certainly admits of this easy and natural construction, if indeed any other construction is possible, to-wit : That whatever rights the company or companies had under the ordinance it was not the object of the charter to interfere with them. The charter gave full power to the city to require that all wires should be placed underground in conduits to be owned and operated by itself or by private ownership, and without this saving clause it might have been contended that it was the intention of the Legislature to abridge the rights of the companies.

The restrictive clause was adopted, therefore, not for the purpose of conferring new rights upon the companies, but simply to save old ones, or at least to put them beyond the reach of construction. They stand, therefore, precisely upon whatever rights they have under the ordinance, and no other, and if the right of repeal passed by implication into the grant which they received, as unquestionably it did, then they took their rights subject to revocation, and the charter can't save them, because in recognizing their rights it necessarily recognizes the right of repeal as one of them. All that the charter does is to save a repeal of the ordinance by implication.

PEARCE, J., delivered the opinion of the Court.

The appellants, being the plaintiffs below, filed a bill in the Circuit Court of Baltimore City, for the purpose of enjoining the city authorities from preventing, obstructing or in any way interfering with the construction by the plaintiffs, under the supervision of the City Commissioner, of underground conduits upon certain streets named in the bill, according to the plans of location and construction filed with the bill, or with the making of the necessary excavations for such conduits, or with the use thereof for the laying and using of telephone wires therein.

The material facts of the case may be condensed as follows :   The Chesapeake and Potomac Telephone Company is a corporation of the State of New York, authorized to construct and operate telegraph lines partly in, and partly out of the State of New York, including all the cities, towns and villages of Maryland, and has ever since its incorporation in 1885, exercised its franchises both in the State of New York and in Baltimore City.

The Chesapeake and Potomac Telephone Company of Baltimore City was incorporated under the laws of Maryland, in March, 1884, its stock being owned by the Chesapeake and Potomac Telephone Company.   It is authorized to construct telegraph lines upon any roads, highways, or streets, within the State, by erecting the necessary poles and fixtures, and to acquire the property of any telegraph companies then, or thereafter existing, and it did thus acquire various telegraph lines.

By the decisions of this Court, telephone lines are included within the term, telegraph lines, and by chapter 161 of 1886, now sec. 254 of Art. 23 of the Code of Public General Laws, all corporations formed as the Chesapeake and Potomac Telephone Company of Baltimore City was formed, and then in practical operation in Baltimore City, were authorized to lay any part of their lines underground, on any route where they were authorized to construct such lines above ground, but all corporations not in practical

operation at the adoption of the Code of 1888, were obliged to obtain a special grant for this purpose from the State, and the assent and approval of the Mayor and City Council, before using either the surface, or the sub-surface of the streets.

Prior to 1889 there were no underground conduits in Baltimore City for the use of telegraph or telephone lines, but during that year the plaintiffs established a Telephone Exchange in a new building upon the corner of St. Paul street and Bank lane, a thickly-settled business location in the central portion of the city, and on May 9th, 1889, the Mayor and City Council enacted Ordinance number (41) forty-one, entitled " An ordinance to provide for lay- ing the wires of the Chesapeake and Potomac Telephone Company of Baltimore City, or of the Chesapeake and Potomac Telephone Company, or of both of said compa- nies, in underground conduits in the City of Baltimore."

The preamble of this ordinance sets forth that if the overhead system of wires is wholly continued, the number of such wires along the street leading to the exchange must be largely increased ; that such increase and concen- tration at so central a point is not desirable, and that the public convenience requires that such wires, so far as practi- cable, should be laid in cables underground.   It then pro- ceeds to enact and ordain that the said two Telephone Com- panies, acting separately or in conjunction, be authorized " to lay their wires to be used in connection with said ex- change," in suitable conduits " under the surface of the streets, alleys or highways in said city now traversed, or to be so traversed by their respective wires," provided said con- duits be so constructed as not to injure any vault, sewer, water or gas-pipe, and provided further, that " *the grant*" above-mentioned should not be deemed an exclusive grant, and that the same should cease and determine, unless three miles of such conduits should be constructed within two years from May 9th, 1889, and that after said two years, and as rapidly as said wires should be laid in said conduits,

all poles of said companies along all streets upon which their conduits were so laid, should be removed, and should not be replaced, except when necessary to make connections with the buildings to be served by such conduits and wires.

It further ordained that said Telephone Companies, "*in consideration of the rights and privileges granted to them by this ordinance,*" before constructing any portion of said conduits, should comply with the following requirements:

1st. To execute an agreement, in form, and with security to be approved by the Mayor and City Council, to pay to the city annually thirty cents for each lineal yard of the first four miles of conduits so constructed, and twenty cents per lineal yard for all over four miles, provided no annual payment should be less than $3,000; also, before constructing any portion of such conduits, to file with the City Commissioner a plan showing the location and character of all conduits next proposed to be constructed, which construction should always be under the supervision of the City Commissioner; and to replace all paving removed in said construction, to the satisfaction of said Commissioner.

2nd. To provide in every conduit so constructed, space, free of cost or rent for the laying therein, by the Fire Commissioners of the city, of a cable for the exclusive and official use of the Police and Fire Alarm Telegraph, and the Police and Patrol wires.

3rd. Before exercising any privileges under said ordinance, to execute a bond in the sum of $10,000, with approved security, conditioned for the faithful performance of all requirements of said ordinance on the part of the said companies.

The bill avers that the plaintiffs accepted the provisions of this ordinance, and that much more than three miles of conduits were constructed within two years from its approval; it sets forth in detail compliance by the plaintiffs with each and every requirement of the ordinance, and charges that said ordinance so enacted and so accepted,

constitutes a contract reasonable in its terms, which the city was competent to make, and which is binding on both parties thereto.

In 1892 the Legislature of Maryland, by chapter 200 of that session, authorized the Mayor and City Council of Baltimore to provide a series of conduits under the streets, lanes and alleys of said city, either by constructing the same, or by authorizing their construction by any person or corporation, but expressly provided therein "that nothing herein contained shall be deemed or taken to modify or change in any manner the provisions of Ordinance number forty-one (41), or the rights and privileges granted thereby." In 1898, the Legislature, by chapter 123 of that session, enacted the new charter of Baltimore City, being a repeal, and re-enactment with amendments, of Art. 4, of the Code of Public Local Laws. In section 6 of Art. 4, as thus amended, under the subhead "Streets, Bridges, and Highways," the general powers of the Mayor and City Council in relation thereto, are enumerated and prescribed. Among these, is the power to *regulate the use* of streets, highways and roads, and to prevent encroachment thereon, or obstruction of the same, and to *regulate* the opening of street surface for the purposes authorized by law or ordinance ; to *regulate the use* of streets, lanes or alleys by telegraph, telephone or other wires, in, under, over or upon the same, and to *require* all such wires to be placed under-ground after such reasonable notice as it may prescribe ; and to provide for a series of conduits—using in this last connection the exact language of the Act of 1892, and then adding, also in the exact language of that Act (except that the word "*Article*" is substituted for the word "*Act*"), that "nothing herein contained shall be deemed or taken to modify or change in any manner the provisions of Ordinance number forty-one (41)."

The bill then avers that in reliance upon the rights and privileges secured by Ordinance 41, the plaintiffs constructed during 1889 and 1890, in the streets of Baltimore, more

than eleven miles of underground conduits, in all of which space was provided, free of cost or rent, for the laying of a wire for the exclusive use of the city, and in most of which such wire was laid, and has been used by the city, from the construction of the conduits down to the present time.   That in thé year 1898 the plaintiffs found it necessary, for the accommodation of their increasing business, to construct additional underground conduits in the northern and western part of the city, in accordance with plans submitted to the City Commissioner, and that they obtained a permit therefor on August 8th, 1898, in pursuance of which, and under the supervision of the City Commissioner, they proceeded with the construction of said conduits and the laying of cables therein, until the middle of November, 1898, and that said last-mentioned cables and conduits, constructed at a cost of over $29,000, are now used in connection with said exchange, and that in all of them provision is made for a wire for the exclusive use of the city of Baltimore.

The bill further avers that, while under Ordinance 41 no permit is required for the construction of said conduits, yet by Ordinance No. 2, of 1892, it is provided that no person or corporation shall, for any cause whatever, dig up, or uncover any of the streets, lanes or alleys of the city, without a written permit therefor from the City Commissioner, approved by the Mayor ; and that the plaintiffs, being willing to comply with this regulation, and having need to construct underground conduits upon Roberts, Madison and other streets, on the 24th of April, 1899, applied in writing for a permit, filing at the same time plans of the location and character of such proposed conduits as required by the ordinances ; but that on April 28th, 1899, the City Commissioner refused to issue the permits applied for, or either of them, without assigning any reason for such refusal ; and the plaintiffs then charge that the true reason therefor was the passage by the Mayor and City Council, on April 18th, 1899, of an ordinance, a copy of which was filed

with the bill, purporting to repeal Ordinance forty-one (41), and providing that such repeal shall not interfere with the use and control of conduits constructed under Ordinance forty-one (41) before January 1st, 1898—provided such conduits do not interfere with the future use of the streets upon which the same are constructed.   The bill further charges that the permit applied for having been wrongfully refused, the plaintiffs are entitled to proceed without such permit, and are desirous to do so, but they aver that they have good reason to believe, and that they do believe that the Mayor intends to use his official authority, and his influence with the police, directed by the Marshal thereof, to prevent by force the construction of such conduits, and they therefore pray for an injunction against the Mayor and City Council of Baltimore, William T. Malster, Mayor of the City of Baltimore, and Samuel T. Hamilton, Marshal of the Police of said city, enjoining them and their agents from interfering in any manner with the construction of said conduits upon the streets named in the prayer of the bill.

The bill, with exhibits sustaining its allegations, were filed May 1st, 1899, and were immediately laid before the Court, JUDGE WICKES, who on the same day, " upon consideration of the foregoing bill of complaint," passed a decree refusing the injunction—from which decree this appeal is brought.

The defendant has moved to dismiss the appeal upon the ground that it appears upon the face of the record, that its object is to obtain from this Court a preliminary ruling on an *ex parte* statement of a question involving public interests of great magnitude, without notice to defendant, or those to whom is confided the duty of protecting those interests ; but this motion cannot prevail.

Sec. 29 of Art. 5 of the Code of Public General Laws provides that whenever any Court having equity jurisdiction shall refuse to grant an injunction according to the prayer of the bill, an appeal may be taken from such refusal.   This section had its origin in the Act of 1832, ch.

197, which authorized an *application* to the Judges of the Court of Appeals, or one of them, when an injunction should have been refused by the County Court. Under that Act, only the bill and the exhibits were submitted to the Judge of the Court of Appeals, and the *original papers* were *forthwith* transmitted by the Clerk. In *Steigerwald* v. *Winans*, 17 Md. 62, the Court held that a complainant has the right to demand a decision on his bill, and if the injunction be refused, to appeal directly to this Court ; but if he elects to postpone his appeal till proof is taken, and the cause decided on it, his right of appeal under this section is gone. In *Bell* v. *Purvis*, 15 Md. 22, it had been previously decided that where an answer comes in before injunction ordered, and so denies the equity of the bill as to authorize dissolution of the injunction on motion to dissolve, the injunction ought not to be granted ; and the same was also held in *Barnum* v. *Gordon*, 28 Md. 97. In that case the Court said that the Judge to whom an application for an injunction is made, may with perfect propriety take time for consideration, and give notice to the parties to be affected by the injunction, and afford them an opportunity to be heard, *in any case in which he may believe the purposes of justice may be thereby subserved.* But it is obvious that this is a matter necessarily within the discretion of the Court, and this discretion must in the present case, as in all others, be deemed to be exercised with as much wisdom and propriety, in forbearing to give, as in giving such notice. The case last mentioned was decided in 1867, and evidently, in consequence of these decisions, ch. 102 of 1868 was enacted, which added to sec. 29 of Art. 5 the provision that the right of appeal thus given shall not be prejudiced by the filing of an answer, nor by the taking of depositions with reference to the allegations of the bill, and that the appeal should be heard on a transcript of the bill or petition, with such other papers in the cause as may be necessary, *so soon as conveniently may be after such transcript shall have been filed in the Court of Appeals.*

The Act of 1868 therefore changed the rule previously declared. In *O'Brien* v. *Balt. Belt R. R.*, 74 Md. 363, the answer was filed before injunction ordered, and, being in, was entitled to be considered, but could not *per se* defeat the right of appeal.

In *Bonaparte* v. *Balt., Hampden and Lake Roland Co.*, 75 Md. 340, Mr. Bonaparte sought an injunction to restrain defendant from constructing its railroad across an avenue by which he had access to his premises, alleging that defendant's charter was void, and work thereunder was being prosecuted without lawful authority. When the bill was filed and preliminary injunction was asked for, instead of granting the injunction at once and outright, the Judge set a day for hearing and until that hearing could be had, passed a restraining order. The defendant contended that this restraining order was a preliminary injunction, and that the order passed after hearing was the dissolution of the injunction already granted, and it therefore moved to dismiss the appeal; but the Court said it was evident the Judge below desired to know whether a case was made for preliminary injunction, and therefore ordered a hearing on the application made by the bill, and the motion to dismiss was accordingly overruled. The inference from this is too plain for controversy—that the Judge might, had he seen fit, have granted the injunction without hearing, and that in such case there would have been a right of appeal. We therefore think the plaintiffs, in the course pursued, were in the exercise of their legal right to present the question raised by the appeal, and the motion to dismiss will therefore be overruled.

It is contended on the part of the defendant that Ordinance No. 41 has none of the elements of a contract, but that it is simply a *license*, revocable whenever the public interest requires its revocation, saving, of course, any rights which the plaintiffs have acquired up to the time of revocation, as attempted by the repealing ordinance; while on the part of the plaintiffs it is contended that the passage of Or-

dinance No. 41 was a proposition to the plaintiffs to enter into a contract securing to them valuable rights and privileges, upon valuable considerations moving from them, and that upon acceptance by plaintiffs of the provisions of said ordinance and compliance by them with all its stipulations, a valid contract was made and concluded, and that after the construction thereunder of three miles of conduits within two years, the contract by its terms became irrevocable, and the repealing ordinance is for this reason inoperative and void. The defendant relies largely, in support of its contention, upon the decision in the *Lake Roland Elevated R. R. case*, 77 Md. 352. In that case an elaborate and learned opinion was delivered by JUDGE BRYAN, holding that the ordinance of the Mayor and City Council of Baltimore authorizing the railroad to lay down double tracks on certain streets in the city, was not irrevocable, and that a subsequent ordinance, repealing that part of the previous ordinance which authorized double tracks on Lexington street, but permitting a single track upon certain conditions, was a valid exercise of power by the Mayor and City Council, but we have not been able to discover any expression of opinion, or any intimation therein, or in the opinion delivered by JUDGE ALVEY in overruling a motion for reargument, that the grant was regarded merely as a license, as was argued by defendant's counsel in his brief in this case. The proof was that if double tracks were permitted on Lexington street, their existence would be incompatible with the use of that part of the street by vehicles of any description, and that the sidewalks alone would be available for use by the general public.

JUDGE BRYAN said it was the duty of the city authorities to preserve the streets for their primary legitimate purposes, and that it was not competent for them by such a grant to defeat these purposes. The whole opinion went upon the ground that such contracts are made upon the implied condition, understood and accepted by the grantee, that if the safety, health or morals of the public shall require the rescis-

ion or modification of such contract it may be rescinded or modified under the police power of the State, or of the city, where the city has been vested by the State with such power. In illustration of the application of this rule of law we may cite the case of *N. Y. & N. E. R. R.* v. *Bristol*, 151 U. S. 556, in which the removal of a grade-crossing constructed under the charter was ordered, and an over-head-crossing was required at the cost of the railroad. The action of the Legislature was sustained, the Court saying that the inhibitions of the Constitution of the U. S. upon the impairment of the obligation of contracts, are not violated by the legitimate exercise of legislative power in securing the public safety, health or morals. And in the later case, of the *C. B. & Q. R. R.* v. *Omaha*, 170 U. S. 57, where the State undertook to alter the terms of a contract under which a viaduct had been built at the joint expense of the city and the railroad, it was said that, where the subject-matter of the contract is one which affects the safety and welfare of the public, it is held to be within the supervising power of the Legislature, *when exercised to protect the public safety, health or morals*, and that the clause of the Federal Constitution, which protects contracts from legislative action, cannot in every case be successfully invoked. " The presumption is that when such contracts are entered into, it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the power of the Legislature."

It was upon the same principle that this Court proceeded in *Rittenhouse* v. *The Mayor and City Council*, 25 Md. 336, in sustaining the repeal of an ordinance providing for the erection of an almshouse, and in annulling a contract with Rittenhouse for its erection, but providing for an equitable settlement for work done under the contract. The site of the building having been found to be unhealthy, due regard for the safety of the inmates and for the public welfare required that the site should be abandoned and work upon the building discontinued. We cannot agree with the coun-

sel for defendant, that JUDGE ALVEY, in his opinion on the
motion for reargument in the Lake Roland case, treated the
grant of the privilege of the streets to the railroad as a
license.   We think he dealt with it as a contract, liable to
rescision or alteration only by reason of the duty of the city
to keep the streets safe for their ordinary uses, and that his
reference to compensation, "in accordance with a well-estab-
lished principle in the case of the revocation of an executed
license," was but a legal analogy altogether appropriate for
the illustration of his argument.   We think the result of
Ordinance No. 41, and of its acceptance by the plaintiffs, was
the creation of a valid contract, and that there is no evidence
or suggestion in the record, of any danger to the public
health, safety or convenience which would warrant its re-
scision by the Mayor and City Council in whole, or in part.
On the contrary, the recitals of that ordinance show that
both the public safety, and the public convenience were con-
trolling considerations with the Mayor and City Council in
its enactment; and in the body of the ordinance the public
interests were sedulously guarded by the following provis-
ions :   1st. That the right to lay underground conduits
should not be deemed an exclusive grant so as to create a
monopoly.   2nd. That the rights granted should be for-
feited unless a permanent underground system was assured
by the construction of at least three miles of conduits within
two years thereafter.   3rd. That all poles or lines where
conduits were laid should forthwith be removed, except
when required for house connection.   4th. That an annual
charge of from 30 to 20 cents for every lineal yard of con-
duit laid should be paid to the city.   5th. That in each con-
duit laid space should be provided free of cost or rent for
a wire for the exclusive use of the city authorities ; and 6th.
That an adequate bond should be given for the faithful per-
formance of all these requirements.   Chapter 200 of the
Acts of 1892, and the *New Charter*, ch. 123, of 1898, both
afford evidence that there has been no change in the views
entertained by the public as represented by the Charter

Commission and the Legislatures of 1892 and 1893, as compared with the views of the Mayor and City Council, by whom Ordinance No. 41 was enacted, since both Acts of the Legislature give authority to the city to provide a series of conduits throughout the streets and alleys, by constructing, or authorizing the construction of the same by any person or corporation, and to *require* all telegraph and telephone wires to be placed in such conduits. No public interest embraced within the police power could be served by repealing Ordinance 41, and thus compelling the plaintiffs either to resort again, so far as relates to all these conduits laid since January 1st, 1898, and to all future extension of their wires, to the inferior pole service which may at any time be prohibited by the city, or to put all such wires in the conduits to be constructed or authorized by the city, and upon new and other terms than those prescribed in Ordinance 41.

The city might, it is true, thus sucure a much larger annual payment from the plaintiffs—one perhaps more fairly proportioned to the value of the franchise granted by the ordinance, but this wish or motive will not justify the repeal proposed. In *City Water Co.* v. *Bridgeport Hydraulic Co.*, 55 Conn. 1, the consideration was pressed upon the Court that a decision in behalf of defendant would be the protection of a monopoly and that a monopoly is odious. In rendering its decision for defendant, the Court said " this argument forgets the fact that it is the judicial duty to preserve contracts inviolate rather than to destroy monopolies; communities may endure monopolies, but cannot endure the violation of contracts."

But apart from the fact that the attempted repeal of Ordinance 41 cannot be brought within the exercise of the police power, so as to justify the repeal upon that ground, there is another and a conclusive reason why it is beyond the power of the Mayor and City Council in any mode to effect its repeal or impair its operation. By ch. 200 of the Act of 1892, the Legislature of Maryland, after three

years trial of the policy inaugurated by the Mayor and City Council upon their own authority, in the contract with the plaintiffs, authorized the Mayor and City Council either to construct, or to authorize any person or corporation to construct conduits throughout the city for the use of telegraph, telephone and electric light wires, to require all such wires to be placed in said conduits, and to prescribe reasonable rentals for the use thereof; thus establishing a general and uniform policy under the sanction of the State, similar to the special policy inaugurated under the sanction of the Mayor and City Council with the plaintiffs. But to this general grant of authority there was annexed a proviso, " that nothing contained in this Act shall be deemed or taken to modify or change in any manner· the provisions of Ordinance No. 41, approved May 8th, 1889, or the rights and privileges thereby granted." Whether the Mayor and City Council had the power to grant ·these rights and privileges at the time that contract was made, it is ·not necessary to inquire, because ch. 200 of 1892 must be taken as a legislative ratification and confirmation of that contract, with all its rights and privileges. *Cooley* in his work ⁄on *Constitutional Limitations*, 6 ed. 466, speaking of contracts by municipal corporations, which, when made, were in excess of their authority, but subsequently have been confirmed by legislative action, says : " If the contract is one which the Legislature might originally have authorized the right of the Legislature to confirm, it must be recognized." In *Balt. & Potomac R. R.* v. *Reaney*, 42 Md. 117, the Act of 1870, ch. 80, while containing no express terms of ratification of the ordinance under which a tunnel had been built by the railroad, used in one section " terms equivalent to terms of express ratification," and JUDGE ALVEY said : " The authority given by the city to make the tunnel is *recognized*, and there is power given to charge additional profits and tolls for its own use. This is a clear ratification or *grant* of authority, at least by *implication*, and it is settled that such authority may be granted

by implication.  *Springfield* v. *Conn. R. R. Co.*, 4 Cush.
63." See also *O'Brien* v. *Co. Com.*, 51 Md. 24, to same
effect. In *Pompton* v. *Cooper Union*, 101 U. S. 202, the
question was whether certain bonds of the town of Pomp-
ton were issued with proper legal authority. Subsequent
to their issue the Legislature abolished the Commission-
ers of Pompton Township and devolved upon a Township
Committee certain duties of the Commissioners, including
the providing of necessary funds, and the payment of in-
terest on these bonds. It was held that this Act was a rec-
ognition of Pompton as one of certain towns authorized to
issue such bonds, and the Court said: " In cases like this,
legislative ratification is the equivalent of original authority,
*and what is clearly implied in a statute is as effectual as what
is expressed.*"

Upon the principle last above stated, the Act of 1892
not only operates as a ratification of Ordinance No. 41 as of
the date of its approval, and of all that had then been done
thereunder, but it also operates from its own date of ap-
proval as a legislative grant for the future of the rights and
privileges thus ratified, and as a legislative prohibition
against any interference by the city therewith. The body
of that Act authorized the city to require *all* companies
using any kind of electric wires, to place them in the con-
duits constructed, or authorized by the city ; but the pro-
viso excepted out of this grant of power the plaintiffs'
companies, and in express language declared that their
rights and privileges should not be modified or changed in
any manner, and the exception was thus not only a grant
of power thereafter to enjoy under the protection of the
State, the rights and privileges they had theretofore en-
joyed under the protection of the city, but it was also the
equivalent of an express denial of power to the city to
compel them at any future time to surrender these privi-
leges, in virtue of the general powers conferred upon the
city to deal with electric companies in this regard.

The new charter, approved March 24, 1898, contained

the same proviso as the Act of 1892, and all we have said as to the legal effect of that Act, is applicable to the new charter, without repetition. Inasmuch as the new charter repealed the whole of Art. 4 of the Public Local Laws of the State, relating to the city of Baltimore, and embracing the Act of 1892, it was necessary to incorporate into the charter the proviso of that Act, in order to give to the plaintiffs the continued assurance that their rights and privileges were beyond the control of the Mayor and City Council, and to remove all doubt upon that subject from the minds of all persons interested in, or dealing with said companies. We hold, therefore, that from the moment the plaintiffs were by the proviso of the Act of 1892 taken under the protecting ægis of a legislative grant, the Mayor and City Council were powerless to destroy, change, or modify their existing rights and privileges, and the ordinance of April 18th, 1899, is wholly ineffectual. The possible unfavorable effect of such a decision upon óther corporations using electric wires, or upon the revenues of the city, however much deprecated by others, are considerations which we are not at liberty to entertain, and we may here repeat the language of this Court in the *Lake Roland Co.'s case,* 77 Md. 382. " We say once more for all, that we are dealing only with the case before us. Franchises and privileges granted by the Legislature cannot be annulled by an ordinance of the Mayor and City Council." Whether it is competent for the State to repeal that part of the new charter which confirms the rights and privileges conferred upon the plaintiffs by Ordinance 41, is a question which does not arise in this appeal. The State has not attempted such repeal, and until it does so, it would be premature and unauthorized to pass upon its right and power to do so.

The remaining question is as to the jurisdiction of the Court to interfere by injunction in this case. The rule is thus stated in *2nd Beach on Injunction,* sec. 1279 : " Equity will interfere to protect and secure the enjoyment of a franchise secured by statute, because it affords the only

plain and adequate remedy. So, it will protect rights of a like character acquired under a lawful municipal ordinance." This rule is supported by numerous cases, both in the State and Federal Courts, among which are *City of Quincy* v. *Bull*, 106 Ill. 337; *Springfield R. R. Co.* v. *Springfield*, 85 Mo. 676; *Easton R. R. Co.* v. *Easton*, 133 Pa. St. 505; *Osborn* v. *Bank of United States*, 9 Wheaton, 842, and *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1, where the Court said: " It has been repeatedly decided in affirmance of the general proposition, that the remedy at law, in order to exclude a concurrent remedy at equity, must be as complete, as practical and as efficient to the ends of justice and its prompt administration, as the remedy in equity.

In *Holland* v. *Mayor and City Council*, 11 Md. 197, it was held that a municipal corporation will be restrained by injunction when attempting to enforce an invalid ordinance, and that case was confirmed in *Page* v. *Mayor and City Council*, 34 Md. 567. In *Hooper* v. *City Passenger R. R. Co.*, 85 Md. 509, it was held that the company was entitled under its legislative grant to use electricity upon any of its lines, and that this right could not be destroyed by the refusal of the Mayor to issue a permit for the erection of the poles, and the injunction which had been granted by the Court below restraining the city authorities from interfering with the erection of the poles, was sustained by this Court. That case is not distinguishable in any material point from the case before us, and in view of that decision, the majority of the Court is of opinion that the proper remedy is by injunction. The writer of this opinion regards *mandamus* as the proper remedy and a memorandum will be filed briefly stating the ground of this view.

We think, however, that in a matter of so much moment to the parties, the purposes of justice will be advanced by permitting further proceedings in the cause, and that an opportunity should be given the defendants to answer, and for a hearing upon the merits, and the cause will therefore be remanded under Art. 5, sec. 36 of the Code, without affirm-

ing or reversing the decree of the Circuit Court for Baltimore City.

> *Cause remanded, without affirming or reversing the decree, for further proceedings in conformity with this opinion, costs above and below to abide the final result of the cause.*

(Decided June 22nd, 1899).

PEARCE, J., delivered the following separate opinion :

Having stated in the foregoing opinion my individual view, that *mandamus*, and not injunction, was the proper remedy in this case, this memorandum is made for the purpose of expressing as briefly as I can the ground of that view.

The case of *Hooper* v. *The City Passenger Railway Co.*, 85 Md. 509, sustained the injunction there granted under a similar state of facts and law, but I have not been able to believe that it should be confirmed and followed when brought before us for the first time, as a controlling authority upon that point.   In reaching this conclusion, I cannot feel that I disregard any of the fundamental principles which underlie the ancient and salutary rule of *stare decisis.* JUDGE DUER, in discussing this question, in *Woolsey* v. *Judd,* 4 Duer, 389, with reference to a decision of CHANCELLOR KENT, said : " We deny that a recent and solitary decision of any Judge, however eminent, ought to be regarded by us as conclusive evidence of existing law.   *   *   It is known to us all that the cases are numerous in Courts of Equity as well as of law, in which Judges have felt it their duty to reconsider and reverse their own decisions and those of their predecessors ; and deplorable indeed would be the actual state of the law (as none who has examined the valuable treatise of *Mr. Greenleaf on Overruled Cases* will doubt), had not these powers of revision and correction been frequently and firmly exercised." And in *Butler* v.

*Van Wyck*, 1 Hill, 438, JUDGE BRONSON said, in a dissenting opinion : " It is going quite too far to say that a single decision of any Court is absolutely conclusive as a precedent. It may be final upon the parties then before the Court, but it does not conclude other parties having rights dependent upon the same question." These observations of distinguished Judges have been repeated here to show that I am not disposed to detract from the reverence with which this rule is regarded by the most eminent lawyers and Judges, and that while I differ reluctantly and with true diffidence from my associates upon the binding force of the decision in question, I am not without high authority in the position I occupy. Had title to property, real or personal, been acquired in reliance upon this decision, or if the *ultimate right* of any character were affected thereby, I should unhesitatingly apply the rule, but as the question is one of *procedure* only, the same reason for its rigid maintenance does not exist.

In *Hooper* v. *City Passenger Railway Co.*, the record shows that Mayor Hooper, in his answer, contended that the refusal to issue the permit, there applied for, could only be reviewed by a proceeding of *mandamus* in a law Court. No opinion accompanied JUDGE DENNIS' decree granting the injunction. In the brief for the appellant in the case, it was contended that the possession by a body corporate of a franchise to be a Street Railway Company in Baltimore City, does not, in itself, entitle it to the use of the streets without the assent of the Mayor and City Council expressed in the usual way, and for this reliance was placed upon the decision of this Court in *State* v. *Latrobe*, 81 Md. 241. In the brief for the appellee, it was contended (without adducing any authority or argument) that the remedy by *mandamus* did not exclude the jurisdiction of equity, and that the permit was only important as evidence to the police of the city of the right of the company; and it was also contended that the jurisdiction already taken by the Court of Equity in the previous decree of June, 1893, determining the right of the company

to use the trolley system on any street in the city on which it had its tracks, made it necessary to resort to the same Court for the enforcement of that decree. In the opinion delivered in that case in this Court, there is no discussion of, nor reference to the remedy by *mandamus*, but it was held, that if it were conceded that the former decree had no force or effect in that case, that the decree appealed from was fully warranted, and that the Legislature having granted to the company the right to use the trolley system, it necessarily followed that the Mayor and City Council could not qualify nor abridge that grant, nor could the Mayor alone, by refusing to issue a permit to place the poles, make that unlawful which the Legislature had declared to be lawful ; and to sustain this statement cited the language of this Court in *Point Breeze R. R.* v. *Latrobe*, 81 Md. 222, as follows : "If the act to be done be a lawful one, and be sanctioned by legislative enactment, and if the person or body corporate proposing to do it be *duly empowered to perform* it, the Mayor and City Commissioner cannot, nor can either of them, make the act illegal, or prevent its performance by refusing to issue a permit."

In examining the cases in which injunctions of this character have been sustained, I have found none, with the single exception of *Hooper* v. *Railway Co.*, in which it was necessary to consider the effect of an ordinance requiring a permit before commencing the work, and the failure to obtain such permit, though duly demanded. The *Point Breeze R. R. case*, in 81 Md., relied on in 85 Md., was not an application for an injunction to restrain interference, but for a *mandamus* to compel the issuance of a permit which had been refused. The language of the Court should, therefore, be interpreted with reference to the character of the remedy invoked and the relief sought by the distinguished counsel who initiated that proceeding and argued the appeal. I readily concede, in the language of that case, that "the Mayor has no right by the simple refusal of a permit to *defeat* the doing of an act authorized to be done, and thus

practically to *abrogate* and *repeal* the formal permission to do it," as would be the result if the issuance of the permit, could not be enforced by *mandamus ;* but, it by no means follows that the Mayor may not thus *delay* the doing of the act, nor that the permit can be dispensed with, especially since, in closing the opinion in 81 Md., the Court says : " We need only add, the franchise can only be exercised in such mode as the city, which has absolute control over its own streets, may by reasonable regulation prescribe." Moreover, the language quoted in 85 Md. from 81 Md., was used in discussing whether the Mayor had a *discretion* to grant or refuse the permit, because if there was such discretion, the *mandamus* could not be ordered at all, and it was held in reference to this same ordinance that there was no such discretion.    I regard the ordinance requiring a permit as preliminary to any digging up of the streets of the city as a reasonable and most salutary regulation, both to guard against wholly unauthorized opening of the surface, and to avoid conflict between those duly authorized, *when exhibiting such permit*, and the police force of the city, who are charged with the duty of arresting the violators of all ordinances.

The two conditions declared by the Court in 81 Md. to be necessary to exist to entitle an applicant to a permit under Ordinance No. 2, are that the *act* to be done be sanctioned by legislative enactment, and that the party proposing to do it be *one* duly empowered to perform it.   In that case, there was due legislative sanction for the act to be done, within a certain time-limit, and this having expired, the right was lost.   Here also there is due legislative sanction for the act, and no time-limit is prescribed. There, as here, there was also a valid ordinance, under which no one, without a permit to dig up the streets, was duly authorized to perform the act proposed.   If not so duly empowered, then the language from 81 Md., relied on in 85 Md., does not appear to me to warrant relief by injunction, though fully applicable in a proceeding for a *mandamus*, because such

permit, when issued in compliance with the ministerial duty to issue it, would duly empower the recipient to perform the act, and in event of subsequent interference by any of the city authorities, the remedy by injunction would then be clear and unquestioned.   In *Edison Company* v. *Hooper*, 85 Md. 110, it was held that the company was not authorized to dig up the streets of the city, to lay conduits for wires, without an ordinance of the Mayor and City Council authorizing the same to be done, because of the power of the Mayor and City Council to regulate the use of the streets.   The Court properly held there was no duty imposed on the Mayor in that case to issue the permit applied for, and therefore the *mandamus* could not be allowed. There the only power conferred on the company was "the franchise of being an Electric Light Company in Baltimore City—no right or privilege to use the streets of the city was conferred."   But here the right or privilege to use the streets, under the supervision of the City Commissioner, was conferred, and under the decison in 81 Md., the duty of issuing the permit was imposed, and *mandamus*, if sought, must have been granted, and it must be supposed would have afforded ample relief to the appellants.   The wrong done here is the refusal to grant the permit to proceed under the supervision of the City Commissioner.   The consequence of this wrong, it is true, is to *delay* the prosecution of the company's work, pending the application to compel the granting of the permit, but not to *defeat the right*, and the appropriate legal remedy for the redress of the wrong thus done seems to me to be by *mandamus.* I cannot perceive in what respect this remedy would be "less complete, less practical, and efficient to the ends of justice, and its prompt administration," than the remedy by injunction, and if I am correct in this view it should follow that the injunction should be denied.

In the recent case of *State ex rel. Nat. Subway Co.* v. *St. Louis*, 42 L. R. A. 113; 145 Mo. 551, the Subway Company applied for a permit, which was refused, to con-

struct service and supply pipes in certain streets in St. Louis, under an ordinance for that purpose, and it was held that where one possesses a clear legal right to have exercised an office, or a franchise, or to have a service performed by the party to whom he seeks to have the writ directed, and where there is no legal specific remedy to which he can resort to compel the performance of this duty, *mandamus* is the proper legal remedy. In the course of the opinion JUDGE SHERWOOD said : " In the lower Courts I have never noticed a precedent, or read an authority which would sanction resort in a case of this kind to a bill for specific performance. Indeed it has been decided that a Court of Equity will not enforce the specific performance of a contract to build a railroad, and by parity of reasoning it would seem that if a Court of Equity would deny specific performance in the case instanced, it would also refuse the relief where it is sought to compel a municipality, or a public officer thereof, to allow a railroad or other similar public structure contracted for to be built."

In *State ex rel. Bell Telephone Co.* v. *Flad*, 23 Mo. Appeals, 185, where the Board of Public Works refused to grant a permit to plant poles because the Telephone Company declined to comply with conditions other than those prescribed by the statute and ordinance, under which they acted, the Court, through Judge Seymour D. Thompson, ordered a *mandamus* compelling the board to issue the permit applied for. These decisions are in accord with leading text-writers. *High on Ext. Legal Remedies*, sec. 327, and *Spelling on Ext. Relief*, vol. 1, secs. 309 and 694, where *mandamus* is declared to be the proper remedy to compel a board to furnish just and adequate facilities to a party. The existence of a full, complete and adequate legal remedy should be here, as in other cases, the exclusion of recourse to equity.

The result of the best consideration I have been able to give to the matter, is that the plaintiffs should be remitted to the remedy by *mandamus*. It may be that this was the

ground on which the learned Judge of the Circuit Court based his decision, his decree not disclosing the ground taken, and if this should be so, I shall feel confirmed in the correctness of the view I have here expressed. Entertaining this view, I think the decree of the Circuit Court should be affirmed, but my associates think otherwise, and I have deemed it proper to concur in the opinion remanding the cause for further proceedings, as we differ only as to the method of procedure.

(Filed July 1st, 1899).