# CHARLES SHIPLEY *vs.* WESTERN MARYLAND TIDEWATER RAILROAD COMPANY.

*Emminent Domain—Condemnation Proceeding of Described Land, Making no Reference to Obstruction of Abutting Highway or Diversion of Stream of Water—Preliminary Injunction.*

When the plat filed in a proceeding by a railway company to condemn land and the description of the land taken do not include any part of the highways, upon which the land abuts and which belong in part to the abutting owner, and include no part of a private stream which flows along a boundary line, and no reference is made in the proceedings to the estate of the owner in such highways and stream, then the company making the comdemnation is not thereunder entitled to divert the course of the stream, or to make excavations in the highway, since these property rights of the land owner were not considered by the jury in estimating the damages sustained by him in the taking of the property as described.

Defendant railway company caused certain land, owned by plaintiff, to be condemned for its right of way under Code, Art. 23, sec. 167, which provides that the jury of inquisition shall value the damages, which the owner will sustain by the use of the property required by the company, and that the inquisition shall describe the property taken or the bounds of the land condemned, and the valuation, when paid, shall entitle the company to the estate or interest in the same, thus valued.  Two different lots of ground belonging to plaintiff particularly described in the proceedings, were condemned by the company.  He filed the bill in this case alleging that the damages awarded to him were solely for the use of these two lots and that the company was about to take other property of the plaintiff, not embraced in the condemnation, and asked for an injunction.  Lot 1, as described by metes and bounds and also on the plat filed in the condemnation proceeding, was bounded on two sides by unopened streets and on another side by the line of Gwynn's Falls, a non-navigable, private stream.  Plaintiff alleged that he had a private right of way in these two streets and a reversionary fee-simple interest in them to the centre line of their beds, and a fee-simple interest to the centre line of the stream; that the railway company proposes to make a cut twelve feet deep across one of the streets, which will destroy plaintiff's easement of way and also his ingress to and egress from the remainder of his land there situated, as well as be a taking of his reversionary interest in one-half of the bed of that street.  *Held,* that the inquisition proceedings do not indicate that the company would take any land outside of the lines of the lot, as therein described or

that the injury caused by the deep cut in the  street was  considered in estimating the damages, or that the company would make  use of the bed of the stream adjoining the lot, and  that consequently plaintiff is entitled to compensation in these respects.

Lot 2 of the plaintiff was  described in the inquisition proceeding as bounded on one side for a considerable distance by Gwynn's Falls, but no part of the stream was included in the return or assessment of damages.   Plaintiff's bill alleged that he owned one-half of the bed of the stream and that the railway company proposed to construct an embankment therein and divert the flow of the water.   *Held*, that plaintiff's rights in the stream cannot be thus taken without compensation and he is entitled to the injunction asked for.

Under Code, Art. 21, sec 92, a conveyance of land, binding on a street or highway, passes to the grantee the interest of the grantor in the highway.   Code, Art 23, sec. 167, provides that in condemnation proceedings, after the inquisition describing the land taken is confirmed, the payment of the valuation shall entitle the company to the interest of the owner in the same thus valued.   *Held*, that "the same" refers to the property taken and not to the estate  or interest of the owner in land not described, such as his interest in abutting highways.

The averment in a bill that a railway company threatens to take property of the plaintiff in the construction of its road, which had not been condemned or paid for, is a sufficient foundation for the issue of a preliminary injunction, although that is not specifically asked for in the bill, but only an injunction.

Appeal from an order of the Circuit Court of Baltimore City (DOBLER, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Thomas G. Hayes* and *R. Lee Slingluff* (with whom was *F. C. Slingluff* on the brief), for the appellant.

In considering the inquisition it must be remembered that a blue print or plat accompanies it, and by express terms is referred to and made a part of the inquisition.   The locations and calls in this blue print or  plat govern the words of description of the inquisition, not that in this case there is any inconsistency between the two, and this location of the lots as it appears on the blue print or plat, is the land taken under the condemnation proceedings, and the dominant tenement

has no power to change location or take one inch more land, than is thus described in blue print or plat which is the governing location of the land for which damage is awarded by inquisition. *Jaqui* v. *Johnson*, 27 N. J. Eq. 526; *Burk* v. *Baltimore*, 77 Md. 471.

In the words of description in inquisition of lot 1, where Gwynn's Falls is referred to as a call, it is the "southern edge of Gwynn's Falls, said point being the common water-mark of said Gwynn's Falls" and the blue print confirms these words of description.

The words of description in inquisition of lot 2 where Gwynn's Falls is referred to as a call, is: "On the eastern bank of Gwynn's Falls, said point being the common water-mark of said falls then following along said eastern bank of Gwynn's Falls."

In lot 1 the reference in inquisition is to Harlem avenue and Tenth street as the limit of the taking, or land condemned and the blue print affirmatively shows that no part of Harlem avenue, Tenth street or Gwynn's Falls is within the limits of the land described and taken by the condemnation proceedings.

The diversion of Gwynn's Falls is not mentioned in the words of description in inquisition or proceedings, but is fully shown in blue print attached to application and inquisition, and is entirely outside of the limits of the land condemned.

The blue print shows the important fact, as before stated, that no part of Gwynn's Falls so to be diverted or upon which the embankment is to be built is included within the limits of the land taken and described in application, inquisition and blue print. The point of diversion of Gwynn's Falls is outside of the limits of the land taken and described in blue print. It is to be noted that not one word is said in the whole proceedings in words as to embankment or about the diversion of Gwynn's Falls.

The language used by the jurors in the inquisition in which the damages are awarded to appellant, after describing lot 1 as it appears on the blue print attached to the inquisition, is as

follows: "Do find and assess the said damages to the said Charles Shipley at the sum of six hundred dollars for the use and occupation in perpetuity by said company of said parcel of land for its railroad."

The damage clause in inquisition for lot 2 is exactly in words like the above, with $150 inserted for $600. Not one word in either is said as to the embankment or use and occupation of Gwynn's Falls or Harlem avenue. The blue print attached to the inquisition conclusively demonstrates that no part of falls, avenue or street was intended to be embraced in the condemnation proceedings. *The red lines on blue print emphasize the sole property to be taken.* And the jurors could only, and did only, award damages for the land within the *red lines.*

Sec. 167 of Art. 23 of the Code designates. two distinct forms of property which one may take under condemnation proceedings, and these are "lands" and "streams." In this case, there can be no possible reason given why the inquisition, which simply describes lot 1 and lot 2 by metes and bounds, should include the bed and waters of Gwynn's Falls, on which the two lots bind. Indeed, the blue print expressly excludes this stream. The jury, under their oath, were limited to giving the appellant solely damages for the two lots which were solely described and referred to in the condemnation proceedings, and not Gwynn's Falls. Not one word is said in this proceeding about use and occupation by the appellee of any part of the bed of Gwynn's Falls adjacent. Can it possibly be successfully maintained that the inquisition, which only gives for a right of way the use and occupation of the two lots, also included the use and occupation of the water and bed of Gwynn's Falls to its center line? Under the language of this section, if the "stream" of Gwynn's Falls was to be used and occupied by the appellee, why is it not referred to and embraced in the proceedings? It could easily have been so included. The bill avers that the appellee threatens to build an embankment in the bed of Gwynn's Falls, west of lot 2 and outside the limits of the land con-

demned.   Can the appellee do this when it has only con-
demned the use and occupation of lot 2 ?   Gwynn's Falls is
not part of lot 2; it is outside its limits.

Again, this section declares that condemnation proceedings
may provide for the *diversion* of streams of water.   Gwynn's
Falls north of lot 2, and not by the inquisition included in the
lines of the land condemned, is actually threatened to be di-
verted and its new channel is through lot 2, and an em-
bankment on the bed of the falls so diverted is threatened to
be constructed by the appellee.   Not one word of this diver-
sion is mentioned in the inquisition or other proceedings, al-
though shown on blue print.   Can it be successfully main-
tained that this property of appellant which is entirely outside
of the lines of lot 2, is included and the appellee entitled to
take it as a result of the condemnation of lot 2 ?   The jury
had no power to award the appellant damages for this diver-
sion because not embraced in the condemnation proceedings.

It is to be noted that by this section that the jury are to meet
"on the lands or near the materials or other property wanted."
Here we have a clear expression of "other property" which
may be required.   How was it possible for the jury to know
that Gwynn's Falls was to be diverted outside the line of lot
2, and an embankment built on the bed of said stream after
the diversion, when not one word is said in the condemnation
proceeding as to this diversion, except in blue print, or that the
reversionary interest or private right of way were to be taken?
The jury could not if they had wished have given appellant
any damages for the diversion or reversionary interests or right
of way because their oath required damages only for the
property taken and described in the inquisition.

The oath of the jury by this section is to "value the dam-
ages which the owner or owners *will sustain* by the use and
occupation of the property required by the said company."
What is the property so required and taken by the appellee
under its condemnation proceedings ?   Let the inquisition an-
swer this inquiry.   It is nothing but the land included in lot
1 and lot 2, described by metes and bounds and shown on

the blue print attached, and embraced in red lines on blue print. Not one word in these proceedings about taking Gwynn's Falls as it flows by these lots on the north; nothing said about diverting Gwynn's Falls north of lot 2; nothing about building an embankment in the bed of Gwynn's Falls after its diversion, and not one word as to appellant's fee-simple reversionary interest to the middle of Harlem avenue and Tenth street, adjacent to lot 1; nor of the valuable private right of way in Harlem avenue, which is destroyed by the threatened construction of appellee's railroad across Harlem avenue, south of lot 1, and thereby destroying access to appellant's remaining land adjacent to lot 1. All damages accruing to the owner of lands from any and every physical effect produced by the construction and use of the canal * * * whether they arise from the alteration or *destruction* of a public or *private way*, the exclusion or the overflowing of waters, *the alteration or change in the current of streams*, or in the destruction of crops, the deterioration of adjacent lands by leakage, or whatever other damage may result from the *natural and physical effects produced by the canal. Van Schoick* v. *Delaware & Raritan Canal*, 20 N. J. Law, 249, 253, 254.

This section, in another provision, in express terms prevents the very wrong which in this case is attempted. The section declares, "and the inquisition shall in all cases describe the *property taken*, or the bounds of the *land condemned*." Is this property of the appellant namely, Gwynn's Falls, reversionary interests and easement of a private way described in the inquisition? It is not, for there is not one word said in the inquisition or elsewhere in the proceedings about this private property. The whole of this property is outside of the lines of lot 1 and 2, as described in inquisition and blue prints. How, then, can the appellee successfully claim that under this section its condemnation of lot 1 and 2 carries this property with it? Let the section speak. Have you described it in the inquisition? If not, under the terms of the section, it is not included in the condemnation.

The appellee's threatened diversion of Gwynn's Falls at lot 2 is absolutely illegal, and the taking of private property without just compensation. It must be remembered that the point of diversion is outside of the limits of lot 2, as described in inquisition and blue print. *B. & P. R. Co.* v. *Magruder*, 34 Md. 84; *Lewis on Eminent Domain*, secs. 64, 510, 350, 573; *Baltimore* v. *Appold*, 42 Md. 456; *Kay* v. *Kirk*, 76 Md. 41; *Baltimore* v. *Warren Co.*, 59 Md. 103; *Aberdeen* v. *Bradford*, 94 Md. 670; *Yates* v. *Milwaukee*, 10 Wall. 504; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 178.

There are numerous decisions which declare the private property in the owners to the use of streams in their natural state, which flows through or by their land, and that they cannot be diverted without just compensation. *Avery* v. *Fox*, 1. Abb. U. S. 246; *Fed. cases*, 674; *Stein* v. *Burden*, 24 Ala. 130; 27 Ala. 104.

If a city builds a bridge over a stream of water and thereby changes the current of the stream, a party owning land on the stream is thereby injured may recover against the city. *Stone* v. *City of Augusta*, 46 Me. 127. The Legislature cannot deprive an individual of the advantages of a stream of water in its *natural flow* over his lands  *  *  * without providing compensation for the injury resulting therefrom. *Trenton Water Power Co.* v. *Raff*, 36 N. J. Law, 335. The State has no right to divert the waters of the small lakes and streams adjoining land in New York except under its powers of eminent domain, upon making just compensation. *Smith* v. *Rochester*, 92 N. Y. 463.

It will not be denied that appellant has a fee-simple reversionary interest to half of Harlem avenue and Tenth street as incident or appurtenant to his land. The Act of 1892, ch. 684, in express terms gives this interest to him. Nor will it be denied that the threatened crossing of Harlem avenue by the appellee's railroad places a new servitude on this reversionary interest, which is a taking; nor will it be denied that appellant has a private right of way in Harlem avenue for all the land remaining after lot 1 is taken. The bill avers that this

private way is not only obstructed by this crossing of Harlem avenue, but *destroyed*, and that the egress and ingress to the remaining land is absolutely taken away and destroyed because on one side of the remaining land is the barrier of the non-fordable private water-course of Gwynn's Falls, and on the other side the cut of twelve feet of the appellee's railroad across Harlem avenue.    Hence, no one can get in or out from the remaining land.    The tenant of appellant who has leased for ninety-nine years 22-100 of an acre on Gwynn's Falls, and who in winter has been gathering, using and selling ice from Gwynn's Falls, is as completely caged in his lot as if a stone wall of great height was built around him.    His wagons loaded with ice can't get off his premises.    This destruction of this private right of way cannot be relieved by any structure that human ingenuity can devise, because, as the bill avers, the land along Harlem avenue rises from Gwynn's Falls to Tenth street at the heavy grade of 12 per cent, the cut on the west side is twelve feet, and any abutment built to the east on the low sloping ground to clear the cut and smoke stacks of the locomotives would have to be 25 feet above the remaining land, and the bridge at that height could not be reached by the occupants of the adjacent land.    It could not be graded down to the west, because appellant's ownership ends at Tenth street and the distance is not sufficient to grade down twelve feet of the cut to grade of tracks.

*Frank* v. *Benesch*, 74 Md. 59, clearly establishes the law, that the appellant in having taken from him by condemnation proceedings lot 1 and lot 2, described by definite metes and bounds, and red lines of blue print, a "mere easement" of a right of way on these lots, "retains all other rights and benefits of ownership, consistent with such easement which belong to the owner of the freehold."    Certainly then, neither reversionary interest, private right of way, nor riparian rights, outside of lot 1 and lot 2, and outside of the appellee's right of way, pass to appellee as a result of the condemnation of lot 1 and 2.

The principle of law which protects the reversionary fee-

simple interest in a highway against the servitude of a steam railroad, without just compensation, is thus stated: "A railroad cannot be laid across a highway without compensation to the owner of the fee." *Lewis, E. Domain*, sec. 118; See also *Trustee* v. *A. R. Co.*, 3 Hill, 561; *Starr* v. *Railroad Co.*, 26 N. J. Law, 592.

The Courts may be said to be unanimous in upholding and maintaining the property rights of an abutting owner to a way of access to his premises. The following are some of the cases stating this principle of the law of eminent domain: A railroad constructed its road across a street in a cut six feet below grade. In a suit by an abutting owner for destroying access to his property; the Court said: "There is no doubt but the right of an owner of a lot in a town or city to the use of the adjoining street is a property right, and a right of which he cannot be deprived without just compensation. This right it has been said, is as much property as the lot itself. * * * The property may not be on the street, yet communicates with it by means of a *private way*, in which event it would seem that an obstruction at the *private way* would be an infringement of a private right." *Rude* v. *St. Louis*, 93 Mo. 408; See also *Brakken* v. *Railroad Co.*, 29 Minn. 41; *Wilder* v. *DeCon*, 26 Minn. 10; *Dawson* v. *Insurance Co.*, 19 Minn. 136; *Milham* v. *Sharp*, 27 N. Y. 611; *Luckland* v. *Railroad Co.*, 31 Mo. 181; *Park* v. *Railroad Co.*, 43 Iowa, 636; *Bissell* v. *Railroad Co.*, 23 N. Y. 61.

It is elementary law that, in a proceeding to condemn the owner's land for a public use under the power of eminent domain, the damages suffered by the owner to his remaining land is an element of damages to be estimated by the jury. *High Bridge Co.* v. *U. S.*, 37 U. S. App. 244.

The injury to appellant's remaining land does not come from taking lot 1, but from the threatened wrong of appellee to make a cut twelve feet deep across Harlem avenue, which is not only not described in the application or inquisition, but is not even referred to in the most remote way, either in inquisition or blue print.

It is to stop appellee from entering upon and taking appellant's land, or an easement in land, which is an interest in land, which is not embraced in the condemnation proceeding, that this suit is brought. . The appellant feels confident that no case can be found where an easement like appellant's, on Harlem avenue, was ever taken as incident to a lot which was alone described and taken, in application and inquisition. The language in other cases of applications or inquisitions will always be found to contain some certain words which, besides taking the lot described, would carry the condemnation or damages for more than the lot taken. The Court's attention is called to the condemnation proceedings in three cases where the words used justified the taking or giving damage for something more than the lot described. *C. & O. Canal* v. *Grove*, 11 G. & J. 401; *Phipps* v. *W. Md. R. Co.*, 66 Md. 321; *High Bridge Co.* v. *U. S.*, *supra*.

No such words as "all damages" or "other damages" or "damages to adjacent property" is found in these proceedings. In this case it is simply and solely lot 1, described by metes and bounds and included in red lines in blue print, which is taken. Can such a description include an easement of right of way which if taken destroys the value of remaining land?

What are the "bounds" of the land condemned in the condemnation proceedings? Go to blue print and trace the red line, and you get these "bounds." Are there included in these "bounds" any part of Gwynn's Falls or Harlem avenue? None whatever; therefore sec. 167 says they are not included in the condemnation proceedings. Go to the description in the inquisition. Is Gwynn's Falls or Harlem avenue mentioned? Not at all, except to limit the "bounds" of the land to be taken. How could the jury consider or give to the appellant damages for property which this provision of sec. 167 declared was not included in the condemnation proceedings? If the inquiry discussed in this part of the brief is answered yes, what becomes of the provisions of sec. 167 which says you must answer it, no? As to taking a private right of way see *DeLauder* v. *Baltimore County*, 94 Md. 1.

The additional servitude of steam railroads on a reversionary fee-simple interest in a street or private way is a taking, under the Constitution, and must be paid for before taking. *Phipps case,* 66 Md. 323; *Thomas* v. *Ford,* 63 Md. 346; *Amer. Tel. & Tel. Co.* v. *Pearce,* 71 Md. 535; *C. & P. Tel. Co.* v. *Mackenzie,* 74 Md. 36; *Canton Co.* v. *B. & O. R. Co.,* 79 Md. 424.

Where real estate is taken by condemnation proceedings, and there are appurtenant to that real estate, easements of streets or private ways, these easements do not go with the land condemned, unless application and inquisition, in addition to providing for the taking of the land, also provides, by use of such words as "other damages," for taking of the easements in question. *Phipps case,* 66 Md. 323.

*Leon E. Greenbaum* (with whom was *George R. Gaither* on the brief), for the appellee.

As to the jurisdiction of a Court of equity, it can be said, that it is at least a debatable question in Maryland as to whether any inference with egress and ingress, however serious, will confer jurisdiction upon a Court of equity by way of injunction. In the case of *O'Brien* v. *Baltimore and Ohio Railroad Company,* 74 Md. 375, an injunction was refused; and similarly in the case of *Garrett* v. *Lake Roland Elevated Railroad Company,* 79 Md. 277, an injunction was denied although the bill alleged that the reduction in the width of the street in front of the plaintiff's lot would prevent access to his property and would render it entirely unsalable. It is true that the *O'Brien case* is distinguished in the case of *DeLauder* v. *Baltimore County,* 94 Md., p. 1, and that in the latter case, speaking through JUDGE PEARCE, the Court says that a destruction of a use is the taking of property; nevertheless, even in the *DeLauder case* the Court was merely passing upon the validity of a demurrer and of prayers *in an action of law,* and did not qualify the doctrine enunciated in the *Garrett case,* to-wit, that an injunction is not the appropriate remedy for an injury to an easement. It is too clear for argument that the

fixing of responsibility in an action at law will neither create nor destroy a well-settled principle as to the jurisdiction of equity.

The appellee does not make any claims to the streets and streams irrespective of the land abutting thereon, as was the case in the O'Brien, Garrett and DeLauder suits, but merely maintains that the damage which the appellant claims to have sustained by reason of occupation have already, as a matter of fact, been the subject of legal ascertainment by a jury in the condemnation case, and that as a matter of law, the inquisition when ratified, gave to the appellee all the rights and privileges which it now seeks to avail itself of, and that the exhibits filed with the bill prove the correctness of these contentions.

It is said in *Lewis on Eminent Domain*, sec. 480A, that where part of a tract is taken, the damages are not limited to such as result from the mere severance of title caused by the taking, but include damages caused by the use of the property for the purpose for which the condemnation is made, and in paragraph 565, that "damages must be assessed once for all, and that when once assessed according to law, they include all the injuries resulting from the particular appropriation and from the construction and operation of the work in a reasonable and proper manner for all time to come." To the same effect is *C. & O. Canal Co.* v. *Grove*, 11 G. & J. 398.

The jury was not left to speculate as to the purpose for which the land was acquired or as to the method in which it was to be utilized, but the bed of Gwynn's Falls and of the platted streets loom up as prominent features in the plan of construction. The stipulation filed in the case also shows that the railroad made a full disclosure of its intention to use the bed of Harlem avenue in the manner which the appellant now complains of. The jury had all this data before it and awarded damages accordingly; and if the question of the adequacy of the amount could be raised in this case, the amount of the verdict could be amply justified by the figures which the jury allowed, towit, six hundred dollars damages in lot

No. 1, though the deed of the entire lot, of which the part condemned was only one-fourth, shows that the purchase price was only $452.81 seven years ago.   Such being the state of the facts, the appellee maintains that the questions raised by the bill of complaint and exhibits are conclusively settled by the case of *Phipps* v. *Western Maryland Railroad Company*, 66 Md. 319.

If there were any element of doubt whatsoever as to whether the jury and the Court had before it the plan which the railroad is now seeking to avail itself of, that doubt is conclusively removed by a consideration of plaintiff's Exhibit G. *This stipulation expressly states that Harlem avenue is to be crossed by the Western Maryland Tidewater Railroad Company and that the crossing will result in an obstruction to the right of way of Charles Shipley.*

How can the appellant contend that the crossing of Harlem avenue was not before the jury and Court when the Railroad Company formally sets forth its intention to cross Harlem avenue and grants to the said Charles Shipley a right of crossing the railroad company's right of way at his own risk and expense? The stipulation contradicts the allegations of the bill and clearly shows that the whole scheme of construction was before the jury and the Court, and the effect of the concession in the stipulation is to give to Charles Shipley all that he can in any event claim to be entitled to; towit., a legal right of going over or under the right of way of the railroad at his own risk and expense in getting to the balance of his lot.   The stipulation is an additional link in the chain of evidence to establish the position that the jury of condemnation had before it all the data by which to arrive at a final and full determination of all the damages which Charles Shipley would be entitled to in any event.

*Legal effect of confirmation of the award of the jury of inquisition.*   It is a well-settled principle of the law of condemnation that all questions as to adequacy of price are conclusively presumed to have been finally settled in the Court and case in which the question was first raised, and that no independent

proceedings can be instituted to attack collaterally the verdict of the jury. *Western Maryland Railroad Co.* v. *Patterson*, 37 Md. 136; *C. & P. Railroad Company* v. *Penn. Rwy. Co.*, 57 Md. 274; *Brown* v. *P. W. & B. Railroad Co.*, 58 Md. 539. As long as the condemning corporation uses the property condemned for the purpose for which it was authorized to condemn, its title is as full and comple as if the property were acquired by deed. Its ownership is subject to no restriction save that of use. *Lewis on Eminent Domain*, 584, 587, and 594.

In the case at bar the same language is employed in condemnation proceedings and in the deeds of Shipley. As a matter of law a conveyance of Shipley's lot would carry with it any rights, privileges and appurtenances flowing or arising from the ownership of the property. It was an incident to the land which passed with the conveyance of the land itself, and the presumption is almost conclusive that a right is not reserved or excepted from a conveyance of the *res* out of which the right arises, unless it is specifically excepted from the grant. *Tiedeman on Real Property*, par. 832.

Whatever doubt there might be as to whether condemnation gives the same rights as conveyance is conclusively settled by sec. 167 of Art. 23 of the Code of Public General Laws, under which the condemnation in this case was maintained, and which specifically provides that a condemnation shall entitle the condemning corporation *"to the estate and interest valued as if it had been legally conveyed by the owner or owners of the same."*

It is, therefore, conceded that as a result of the principles of the common law and of the Act of 1892, relied on by the appellant, that Mr. Shipley acquired title to the centre of Gwynn's Falls and of the streets on which his lots abut, but it therefore necessarily follows that any such title acquired as the result of the acquisition of his property passed to the corporation which condemned the property without being specifically mentioned in the proceedings by which the property was condemned. The company holds the property as if it had been legally conveyed.

It was needless to mention an incorporeal right in a condemnation which covered the corporeal *res* out of which the right arose, just as it is superfluous to mention it specifically in a deed. The presumption in both cases is that it passes by a grant or condemnation of the property out of which it arises. The appellant could not dispute the title of his grantee to the falls and streets if he had made a voluntary conveyance; he cannot dispute the title of the railroad, obtained through involuntary alienation, except to the extent that the railroad itself undertook to lessen the effect of the condemnation by filing a stipulation through which it deprived itself of the right of exclusive occupation and use of the bed of Harlem avenue which, as well as Tenth street, is a paper street, and not an opened and accepted public thoroughfare.

If lots Nos. 1 and 2 had been legally conveyed to the Western Maryland Tidewater Railroad Company, it would have had a perfect right to have utilized the bed of Gwynn's Falls and the bed of the streets now in controversy as it saw fit, because a grant of the principal thing would have had, as a legal consequence, a grant to all the subordinate privileges and rights arising from the ownership of the principal thing. Condemnation has the same effect in this respect as conveyance. The Western Maryland Tidewater Railroad Company owns lots Nos. 1 and 2. The legal effect is that it is not a trespasser when it occupies the bed of Gwynn's Falls and the bed of the streets abutting thereon, but that on the contrary its ownership of the lots is the result of condemnation and results in ownership of the bed of the stream and of the streets on which the lots abut. The law of condemnation does not favor a partial assessment of damages or a partial acquisition of rights. It contemplates a judicial ascertainment of all the damages directly or indirectly flowing out of and resulting from the condemnation. It is based upon a final valuation of all damages in one determination. It might as well be maintained that the acquisition of property by condemnation did not carry with it rights of utilization or any of the essential attributes of ownership as to contend that it was limited to the

physical surface area actually described, and did not include rights above, below and to the side of the surface which are dependent thereon for their existence.

Even if the Court should be of the opinion that the facts of the bill are legally sufficient to warrant the issuance of a preliminary injunction, that it should not direct the issuance of the same, *inasmuch as a preliminary injunction is not prayed for in the bill.* General Equity Rule No. 15 (Code, Art. 16, sec. 133), provides that if an injunction or any other special order be required pending the suit, that it should be specially prayed for. It cannot be granted unless it is so specially asked for. *Miller's Equity Procedure*, par. 577.

BOYD, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court of Baltimore City refusing to grant an injunction against the appellee on the bill and exhibits filed by the appellant. The defendant is constructing a line of steam railroad from a point near Walbrook to the Patapsco river, being incorporated under Art. 23 of the Code of Public General Laws. On the 3rd day of April, 1903, the railroad company condemned, under separate proceedings, two parcels of land of the appellant, referred to in the record as lot 1 and lot 2.

Lot 1 contains 73-100 of an acre of ground, and is a part of a parcel of land owned by the appellant in fee containing 2 and 83-100 acres, bounded on the north and east by Gwynn's Falls, on the south by Harlem avenue, and on the west by Tenth street. It was conveyed to him by a trustee authorized to sell the real estate of the Heald estate. and the deed describes the land as binding on Harlem avenue, Tenth street and Gwynn's Falls. The plat filed with the condemnation proceedings of lot 1 shows that it takes all of the front of the appellant's land on Tenth street, between Harlem avenue and Gwynn's Falls, and abuts on the falls on the north and the avenue on the south.

The bill alleges that the avenue and street are not public highways, that the appellant has a private right of way in

them, and that by virtue of the Act of 1892, ch. 684, he has a reversionary fee-simple interest from the southern and western boundary lines to the centre line of Harlem avenue and 10th street.    It also alleges that Gwynn's Falls is a private, non-navigable and non-fordable river of water, and that by his purchase the appellant also acquired a fee-simple estate to the centre line of that stream, together with all the beneficial uses of the water therein.

Lot 2 contains one and 87-100 acres and is a part of a larger tract leased to the appellant for ninety-nine years.   The description of this lot calls for Gwynn's Falls, and runs with its eastern bank for a considerable distance.   The interest of the owners of the fee and the leasehold of the appellant were condemned.   The bill alleges that the appellee proposes to use the plaintiff's property interest in the bed of Gwynn's Falls for the construction of an embankment, and to divert the natural flow and course of Gwynn's Falls, and in so doing it will destroy the regularity of the current and make the flow fitful, etc., and thereby greatly injure and impair the value of the plaintiff's land adjacent to lot 2.   The plat filed shows that the appellee does propose to cross the present course of Gwynn's Falls, and to divert the flow of it so that the water will run on the easterly side of lot 2, but within the lines of that lot.   The contention of the appellant is that the appellee has only condemned and paid for the two lots contained within the courses and distances given in the condemnation proceedings, and particularly shown on the plats, and that it cannot occupy the part of Harlem avenue which he claims to own, or occupy or divert Gwynn's Falls under the condemnation proceedings spoken of.   We will request the reporter to print with this opinion one of the plats used at the argument, which is conceded to be sufficient to show the two lots condemned and their relation to the streets and Gwynn's Falls the shaded line being the outlines of the two lots.

1. The appellee did not deny at the argument that the deed to the appellant by virtue of the Act of 1892, ch. 684, passed to him all the right, title and interest of the grantor, to the

PLAT

SHOWING

Land to be acquired of

**CHAS. SHIPLEY**

BY THE

Western Maryland Tidewater Railroad Company

centre of Harlem avenue, and by the common law, as con-strued in this State, likewise gave to him the fee in the bed of the falls to the centre line, with the beneficial use of the waters of the stream. *Browne* v. *Kennedy*, 5 H. & J. 195, and *Gump* v. *Sibley*, 79 Md. 165. But it contends that it was not necessary to specifically mention Harlem avenue or Gwynn's Falls, in the condemnation proceedings, and that the damages allowed by the jury covered all those the appellant was entitled to as owner of lot 1, including any that he may sustain by the appellee's occupancy of that avenue and the falls.

We will first consider his contention with reference to Harlem avenue. The bill alleges, and one of the plats filed shows, that this avenue rises from Gwynn's Falls to 10th street, with about a twelve per cent grade, and that the appellee proposes to make a cut across the avenue abutting on lot 1, of a depth of twelve feet on the west side and four feet on the east side of its road, as proposed to be made; that this cut will abso-lutely destroy the plaintiff's easement of a private right of way, which is appurtenant to and belongs to the remaining land between lot 1 and the falls, binding on the avenue, and the egress from and the ingress to said remaining land "will be destroyed and not only obstructed," and that his reversionary interest from the southern line of lot 1 to the centre of the avenue will be *taken*.

The jury was "sworn and charged justly and impartially to value the damages which the said Charles Shipley will sus-tain by the use and occupation of all that lot or parcel of ground owned by him, which is described as follows: "— the description was then given of this lot as included within the shaded lines on the plat above mentioned. That oath is pre-scribed by sec. 167 of Art. 23 of the Code. The inquisition concludes that the jurors "do find and assess the said dam-ages to the said Charles Shipley at the sum of six hundred dollars, *for the use and occupation in perpetuity*, by said com-pany, *of said parcel of land* for its railroad." The theory of the appellee is that inasmuch as the jury was sworn to value

*the damages* which the owner would sustain by reason of the occupation and use of this lot, and accordingly fixed "*the said damages*," they were called upon to allow and did allow *all* damages he sustained, including those now complained of. The general rule is that "The measure of damages is the difference between the value of the whole tract before the taking, and the value of the remainder after the taking." *Lewis on Em. Domain*, 471A, and that "damages must be assessed once for all, and that when once assessed according to law, they include all the injuries resulting from the particular appropriation and from the construction and operation of the works in a reasonable and proper manner for all time to come." *Ibid*, 565. But the damages referred to by that author are those resulting from the taking and use *of the particular tract condemned*, and that cannot refer to such damages as will result from the *taking* of some other property of the owner, within the lines of the proposed road. Suppose, for example, the appellant had owned the land on the south side of Harlem avenue, through which the road runs, it could not be successfully contended that inasmuch as the plats showed that the road would go through *that* land in order to reach that contained within the lines of lot 1, therefore the damages allowed for lot 1 included those that he would sustain by taking his property on the south side of Harlem avenue. Or, to take another illustration, which is still more analogous, suppose the description of the land in the condemnation proceedings had only included a lot of 181 instead of 281 feet in depth, north of Harlem avenue, but the plat showed that the centre line of the proposed railroad ran through the whole lot to Gwynn's Falls, could it be pretended that the jury had allowed damages for the whole lot to Gwynn's Falls, and therefore the appellee could take possession of it? Surely not. When the law authorizes the jury to consider the damage to the remainder of an owner's land, it refers to that portion which is not included in the inquisition, but not to some part of the tract which *will be actually taken* and is not included within the description given in the proceedings. As it is conceded that the Act of 1892

vested the fee in the appellant to the centre of Harlem avenue, there would seem to be no room to doubt that a railroad company cannot take the interest he thus had without compensation—especially in the manner that this is proposed to be used, making a cut from four to twelve feet deep. That Act certainly does not *in terms* include land acquired by condemnation. It provides that "all devises, gifts, grants or conveyances of land binding on any street or highway   *   *   * shall be construed to pass to the devisee, donee or grantee therein, all the right, title and interest of the devisor, donor or grantor of the said land," etc. The appellee is neither a devisee, donee nor grantee of this land, but it is said on its behalf that the statute provides that after the inquisition is confirmed, the valuation when paid or tendered "shall entitle the said company to the estate and interest *in the same* thus valued, as if it had been legally conveyed by the owner or owners of the same," and that hence the condemning company has the same right to the street that the owner had under the Act of 1892. But that provision is immediately preceded by this. "and the inquisition shall, in all cases, *describe the property taken or the bounds of the land condemned,* and the quality or duration of the interest in the same, valued for the company, and such valuation when paid or tendered   *   *   *   shall entitle," etc.  "*The same*" refers to "*the property taken or the bounds of the land condemned,*" described in the inquisition, and does not refer to any estate or interest in land not so described.

The description of the land in those proceedings would, however, seem to affirmatively exclude any idea of taking under the condemnation of lot 1 any interest of the appellant in Harlem avenue. It reads thus: "Beginning at a point where the centre line of the said Western Maryland Tidewater Railroad crosses *the dividing line between the lands of the said Charles Shipley* and *those of the C. M. Heald estate* (Harlem avenue), and running thence *with said dividing line* south 87 degrees 19 minutes west 46.52 feet to a point, said point being the northeastern corner of Tenth street and Harlem avenue

(*C. M. Heald estate*), thence with said dividing line" and then after describing the westerly, northerly and easterly lines of lot 1 calls to go "to a point in the line *between the lands of the said Charles Shipley* and *those of the said Heald estate,* thence with said line," etc., to the beginning. That description is in the application for the warrant and in the inquisition, and *the dividing line* on which the description begins and ends is the southerly line of lot 1, which is on the northerly side of Harlem avenue. It refers to the lands on the other (southerly) side of the dividing line, *as those of the Heald estate*—thus in terms excluding all idea of ownership by Shipley on that side of the dividing line, and hence it would seem impossible to suppose that the jury in their valuation had allowed anything to Shipley for land which they expressly said *belonged to the Heald estate.* If the company desired to say to the jury, and the jury wanted it understood that nothing was to be included in their valuation for anything south of that line, it would have been difficult for them to have expressed it more plainly than they have thus done.

But independent of that, we have seen that the statute expressly requires that "the inquisition shall *in all cases describe the property taken, or the bounds of the land condemned, and the quality or duration of interest in the same, valued for the company.*" There is nothing whatever in this inquisition, or in any of the proceedings before the jury, to indicate or intimate that the appellee proposed to *take* any land outside of the bounds of this lot. It is true that there is in the record a stipulation signed by the attorney for the railroad company in reference to the obstruction of the easement of the private right of way of Shipley in Harlem avenue, but giving that all the possible effect that can be claimed for it, it was apparently *filed in Court* and was not before the jury—it is certainly not made a part of the inquisition and nothing is said in that about it, or any rights Shipley had in Harlem avenue. Under our statute the property of infants, those who are *non compos mentis* and non-residents can be condemned, and in the case of the latter notice can be given by publication in a newspaper of

the meeting of the jury of inquisition. There is therefore good reason for requiring that the inquisition shall *in all cases* de‑ scribe the property taken, or the bounds of the land con‑ demned, for it might be that an owner would sustain much more serious injury by the taking or destruction of some rights not mentioned, than by the taking of the property described. Take this case for illustration. If the appellant's estimate of the value of his property that remains, which he claims will be destroyed, proves to be anywhere in the neighborhood of what it is really worth, it is vastly more valuable than what the jury allowed, and yet if the appellee's theory is correct the railroad company might acquire that interest for a small sum by not disclosing in any of the proceedings that it was being taken. Or in case of a non-resident the jury might act in his absence without his having any actual knowledge that the pro‑ ceedings had been instituted and the jury might not be in‑ formed as to what they were passing on. It is perfectly feas‑ ible to make it appear in the proceedings, with reasonable ac‑ curacy, what property and rights are proposed to be taken, and when they are thus taken against the will of the owner, under the power of eminent domain, there ought to be as defi‑ nite a description of them as can well be given. Of course unjust demands by property owners should not be encouraged, or permitted to improperly stand in the way of public improve‑ ments, and Judges oftentimes see in the discharge of their du‑ ties how rapidly values of properties seem to rise when it is known that a railroad company wants to acquire those along the line of its proposed road, but it is only reasonable to re‑ quire a company vested with the power of eminent domain to so describe "the property taken or the bounds of the land condemned," that there will be no mistake as to what is to be taken.

Much of what we have just said also applies to Gwynn's Falls north of lot 1. The description of the property as to that is as follows: "Thence with said dividing line N. 2 degrees 24 minutes west 281.00 feet to *the southern edge of Gwynn's Falls,* said point being the common water-mark of said Gwynn's

Falls," and the northernly line of lot 1 runs, according to the plat, along the southern edge of the Falls. Any land owned by Shipley beyond that is not included within "the bounds of the land condemned," nor does the inquisition describe or refer to any property rights in that stream belonging to him, which the company proposes to take. The jury was sworn and charged to value the damages which the appellant will sustain by the use and occupation of the lot described— not some other lot or parcel of ground owned by him, but that described in the inquisition.

· The learned counsel for the appellee laid considerable stress on the case of *Phipps* v. *Western Maryland Railroad Company et al.*, 66 Md. 319. There this Court affirmed a decree dismissing a bill for an injunction which was filed to restrain the railroad company from maintaining and using the railway tracks laid partly on the sidewalks and partly on the carriage way in the bed of a street in front of the complainant's property. A part of their land had been condemned by the Western Maryland Railroad Terminal Company, which by its charter was authorized to provide terminal facilities for the business of the Western Maryland Railroad Company, and the tracks on the land condemned were connected with those of that Company. This Court, after referring to the well known doctrine that the Legislature had no power to authorize the Terminal Company to take the property of the complainants without compensation, said a new burden was imposed on the estate of the owners of the fee by laying the tracks in the street, but the injunction was refused on the express ground that the complainants had been compensated by the jury, in the condemnation proceedings, for damages sustained by the use of the street, as well as those for the lot actually taken. BRYAN, J., in delivering the opinion of the Court, said, "The Sheriff's return shows that the jury was sworn to value the said triangular lot and the improvements on it, and *the other damages* which the owners would sustain by the taking of the land  *  *  * and the *inquisition itself shows* that the jury made an estimate both of the property, *and the other damages* which would re-

sult to the owners from the taking of it." Again he said, "It is also clear to us that they paid these owners all damages which were caused by the laying of the tracks." While we think it would be better practice under such facts as we have in this case to describe with accuracy the portion of a street, or bed of a stream, proposed to be taken, if the proceedings showed by some appropriate reference to it that such was in fact taken and valued, this case would be within the meaning cf *Phipp's case*, but as we have already intimated, we think the proceedings relied on not only do not show that damages were allowed to the appellant for injury done to him by the use of the avenue or the falls, but they show the contrary, so far as they at all reflect on the question.

2. The bill alleges in reference to lot 2 that the defendant threatens "at once to take and use the plaintiff's property interest in the bed of Gwynn's Falls for the construction of an embankment * * * and also to divert the natural flow and course of Gwynn's Falls * * * and thereby greatly injure and impair the value of the plaintiff's land adjacent to lot 2, and extending to the east along Gwynn's Falls for a long distance." Although the appellant only owned the leasehold interest in this property, the case of *Gump* v. *Sibley*, *supra*, would seem to give him the same right to the center of the stream under this lease for ninety-nine years, that he would have had if it had been conveyed to him in fee. From what we have said, it will be apparent that we are of the opinion that his rights in this stream cannot be thus taken without compensation. Sec. 167 of Art. 23 of the Code expressly provides for condemnation proceedings for the diversion of streams, but no reference is made to that in this inquisition and it is evident that no damages have been allowed for it.

3. In view of what we have stated, we are of the opinion that the injunction should not have been refused. Whether or not the appellee can successfully answer any of the material allegations in the bill we cannot tell, and, of course, we have for the purposes of this case as now presented to us assumed them to be correct, and if they are, under our con-

struction of the rights of the appellant as alleged, he is en-
titled to an injunction. · The case of *American Telephone and
Telegraph Company* v. *Pearce*, 71 Md. 535, is sufficient au-
thority for that, without citing other cases.   It was there said
"We have no doubt as to the sufficiency of these averments,
or of the jurisdiction of a Court of equity to grant an injunc-
tion in such cases," and after stating that a telephone or tele-
graph company is subject to the provisions of Art. 3, sec. 40
of the Constitution, as is a railroad or other ·corporation
clothed with the power of taking private property for public
use, it was added "This clause of the Constitution is too plain
to admit of·any doubt, and the averment that the defendant
is proceeding, or threatens to proceed, to construct its lines of
poles and wires on and over the complainants' lands without
their leave or license, and without paying or tendering to
them compensation for the use of their lands for this purpose,
is of itself enough.   The Court could not properly refuse an
injunction in the face of such an averment."

· It was suggested for the appellee that the bill did not pray
for a preliminary injunction, and therefore the defendant could
not be precluded from having an opportunity to answer the
allegations of the bill.   But the bill does specifically pray for
an injunction and that is the only relief asked for, excepting
the prayer for general relief.   We are not aware of any de-
cision in this State that requires the plaintiff to pray for a
preliminary injunction under these circumstances.   One issued
on such a bill as this before hearing is a preliminary injunc-
tion.   The Judge to whom application is made, instead of
granting it at once, may take time for consideration and give
the party to be affected an opportunity to be heard.   As a
rule that is a practice to be commended, as it sometimes hap-
pens that great injury is inflicted upon a defendant by the
granting of an injunction without notice to him.   In this case
we·do not see that the appellant will suffer by such delay as
will be caused by giving the appellee an opportunity to an-
swer,·while on the other hand,·if it should eventually be
shown that the appellant is not entitled to the relief sought,

the delay resulting from an injunction might seriously interfere with the construction of a public improvement. If, in the meantime, the appellee should undertake to obstruct or injure Harlem avenue in the manner alleged in the bill, or do any other act complained of, which will necessarily cause serious injury to the appellant, on application to the Court below a restraining order can be passed to prevent that until the hearing of the cause. Following the precedent adopted in *C. & P. Telephone Company* v. *Baltimore City*, 89 Md. 689, we will remand the cause, without affirming or reversing the degree, for further proceedings in conformity with this opinion, but will direct the costs in this Court to be paid by the appellee.

> *Cause remanded, without affirming or reversing the decree, for further proceedings in conformity with this opinion, the costs in this Conrt to be paid by the appellee and those below to abide the final result of the cause.*

(Decided January 22nd, 1904.)