MAYOR AND CITY COUNCIL OF BALTIMORE

vs.

LOUISA V. MEGARY ET ALS.

*Condemnation of land: Baltimore City; prayers; compensation for damages; assessments for benefits.*
*Viewing of premises by jury.*

The "just compensation" required by the Constitution to be paid when private property is taken for public use includes not only the value of the part of the lot condemned, but also a due allowance for damages for any injury done the remainder, p. 24

In view of section 179 of the Charter of Baltimore City, providing that the jury in condemnation cases may *view* the property, some effect must be given to such view made by the jury.
p. 27

*Query*: Whether the fact that a jury did so view the premises prevents the Court from taking the question of damages away from the jury, if, in the Court's opinion, there was no legally sufficient evidence of damages actually offered at the trial? p. 28

In condemnation cases there is no inconsistency in estimating damages to the remainder of the lot, and then, in the same proceedings, assessing benefits against the property owner; the two transactions, of fixing damages or compensation, and of assessing benefits, are separate and distinct. p. 28

Benefits are to be measured by the enhanced value of the remaining portion of the lot, which is due to the entire improvement, and not simply to property owner's land taken. p. 31

In condemnation cases, the respective circumstances are so peculiar that it is difficult to announce a rule for assessing damages that would be applicable to all of them.            p. 30

On an appeal in a condemnation case instituted in the City of Baltimore, there was a prayer on behalf of the plaintiff that, "The Court instructs the jury that in making up their verdict as to the amount of damages to be allowed the property owner for the condemnation and taking by the Mayor," etc., "of Baltimore of that portion of her lot so condemned and taken, they should take as the measure of damages the difference between the present market value of the entire lot before taking, and the present market value of the remaining portion fronting on University Parkway after taking; but in ascertaining the present market value of said remaining lot, they are not to consider any value that may accrue thereto by reason of the opening of Thirty-seventh street from Charles Street avenue to University Parkway." In view of all the facts of the case, the prayer was *held,* not to be erroneous.            p. 30

Another prayer of the plaintiff in the case was: "The Court instructs the jury that in making up their verdict as to benefits to be assessed to the property owner, the only matter for their inquiry is the amount of increase in the actual market value of the remainder of the lot on University Parkway not taken, which will be caused by the acquisition through these proceedings by the Mayor and City Council of Baltimore, of *title* to *her* land condemned and taken by the City in and for the opening of Thirty-seventh street from Charles Street avenue to University Parkway, and their verdict as to benefits should be limited to such increase, if any there be, and they can not inquire into or take into consideration the amount allowed by the Commissioners for Opening Streets, or the amount that they, the jury, may allow the property owner as damages for the land so condemned and taken by the City"; it was conceded by the appellees that the benefits were to be measured by the enhanced value of the remaining portion of the lot, due to the entire improvement, and not simply to the property owner's land taken, and it was *held,* that in view of the other prayers in the case, the use of the word "the" instead of the word "her" (which is

italicized) would have rendered this prayer unobjectionable, and in view of all the facts of the case it was *held,* that this inaccuracy did not present reversible error.     pp. 31, 32

Reference in such a prayer to the enhancement of the value through the acquisition of *title* to the land taken, was sufficient, under the facts of the case, and did not exclude consideration of the use of the land for street purposes, and under the facts of the case was *held,* not to be reversible error.     p. 33

*Decided December 2nd, 1913.*

Appeal from the Baltimore City Court (STUMP, J.).

The facts are stated in the opinion of the Court.

The above is a plat of the lots and proposed improvements referred to in the Opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Benjamin H. McKindless,* the Assistant City Solicitor, (with whom was *S. S. Field,* the City Solicitor, on the brief), for the appellant.

*Isaac T. Parks, Jr.,* and *Albert C. Ritchie,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from the rulings of the Baltimore City Court in the trial of an appeal from the award of damages and the assessment of benefits made by the Commissioners for Opening Streets in connection with the condemnation of part of a lot of ground owned by Louisa V. Megary, one of the appellees. The Commissioners awarded her $15,-104.00, and assessed her remaining lot for $1,269.90 benefits. By the inquisition of the jury the damages were increased to $20,821.00, and the benefits were reduced to $800.00. The appellant complains of the action of the lower Court in granting the property owner's second, third, fourth, sixth and seventh prayers.

By Ordinance Number 145 of the Mayor and City Council of Baltimore, approved July 23, 1912, the City provided for the condemning and opening of Thirty-seventh Street from Charles Street to University Parkway. Charles Street runs north and south and University Parkway runs northwest and southeast, intersecting Charles Street at an angle of about forty-five degrees, as appears from the blue print of the plat filed. Mrs. Megary owns in fee simple a lot which fronts 100 feet on the west side of Charles Street, running westwardly to the northeast side of University Parkway, the northern line being 300 feet in length, and the southern line 220.68 feet, the western line being 26.07 feet, and the south-

western line fronting on University Parkway 108.46 feet. Thirty-seventh Street now ends at Charles Street, its northerly side extended across Charles Street, being 20.81 feet north of Mrs. Megary's lot. It is proposed to throw into Thirty-seventh Street the triangular space between Charles Street and University Parkway south of a curved line running from a point on Charles Street 326.39 feet north of the intersection of Charles Street and University Parkway (being 20.81 feet north of Mrs. Megary's lot) to a point on University Parkway 23.80 feet from the southerly line of her lot. That will take the entire front on Charles Street of Mrs. Megary's lot, and while it will leave a little over 84 feet frontage on University Parkway, and nearly 151 feet on the curved front on Thirty-seventh Street as extended, the remaining lot will be of a very peculiar shape and difficult to build on to advantage.

1.   The appellees' second prayer instructed the jury "that they should award to the property owner as damages, in addition to the fair market value of the lot taken and condemned by the Mayor and City Council of Baltimore, in the opening of Thirty-seventh Street between Charles Street Avenue and University Parkway, an amount equal to whatever damages, if any, caused to said property owner by reason of such taking, to the remaining lot of said property owner not taken".

The City filed a special exception to that prayer on the ground that there was no evidence legally sufficient to show that the remaining lot of the property owner had suffered or sustained any damage by reason of the taking of her property. It is thoroughly settled in this State that "The 'just compensation' required by the Constitution to be paid where private property is taken for public use, includes not only the value of the part condemned, but also a due allowance of damages for injury to the remainder"; *Baltimore* v. *Garrett,* 120 Md. 608, and cases there cited.

The evidence of Messrs. Turnbull, Appold and White, experts produced by the appellees, shows that the property as it is before the opening of the street has two fronts—one on Charles street and the other on University parkway. Mr. Appold, after giving the dimensions of the lot, said "That permits the lot to be divided into two portions, with a building site on both Charles street and University Parkway, and that the Charles street front is worth giving up 120 feet depth for the Charles street front on the short line, and 100 feet depth on the short line for the University Parkway front, and of course on the long line it would be longer for each lot. I think the Charles street front is worth $150 under those conditions, and the University Parkway front $100. That makes $250—and 100 feet at $250 is $25,000." It will be recalled that the northern line of the whole lot is 300 feet long and the southern line is 220.68 feet. The above estimate was of the whole lot, and he valued the part condemned at $20,000 and the balance at $5,000. As he valued the front on Charles street at $15,000, all of which was taken with the exception of a small triangle along the northern line, which could be of little or no value, and the University Parkway front at $10,000, and then fixed the damages for all taken at $20,000, it is manifest that he took into consideration the damage done to the remaining lot. The part of the University Parkway front which was actually taken was not worth as much as the part of that front not taken, for the latter has about 84 feet front, while the other only has about 23 feet front, and there was not as much land of that part of the entire lot taken as there was left.

Precisely how much he valued the respective portions of the University Parkway front he did not state, but on cross-examination in answer to the suggestion that according to his figures—$15,000 for the Charles street front and 23 feet at $100 a foot on University Parkway—they would amount to $17,300, while he fixed the damages for the whole taken at $20,000, he said: "The lot that the city leaves under this proceeding is a very irregularly shaped lot. In my judgment

that seriously impairs the value of the lot as against a lot
such as I have described above. It makes it more difficult to
build on. Unless it is very successfully handled, it could not
be built on in good taste but it might, however, under suc-
cessful handling. In my judgment that detracts from the
value of the lot, it is irregularly shaped you know." He
thus clearly indicates that in his estimate of $20,000 he took
into consideration the damages to the remaining lot by rea-
son of the shape it was left in by what the city took. Messrs.
Turnbull and White valued the whole lot at $30,000—the
part taken at $24,000 and what was left at $6,000. Mr.
White said in answer to the question why he placed the valu-
ation of $6,000 on the part of the lot that was not taken;
"purely on account of what I think that lot will sell for, left
as it will be left and the curious shape in which it will be
left." When asked to explain the situation, he said; "I think
the shape of the lot almost explains itself. It is an unusual
shape. It is not capable of any great, high-class development,
except one house, and very few people are able with advant-
age to improve the lot to their satisfaction, knowing this is
a high-class neighborhood." Mr. Bernard, an expert pro-
duced by the city, said: "I did not make any estimate of the
damage to that lot. If the lot were being taken and the pur-
pose of cutting into that lot would be for private purpose, the
lot would undoubtedly be damaged, but when we fixed our
benefit assessments on that lot we took into consideration all
the damages which were done to that lot by reason of the
cutting through of this street. Otherwise our benefit assess-
ment would have been in the neighborhood or somewhere
around four or five thousand dollars." As he estimated the
benefits at $1,500, he apparently thus estimated the dam-
ages to the lot to be from $2,500 to $3,500. But valuing the
University Parkway front as a whole, either at $10,000, ac-
cording to Mr. Appold, or $12,000, according to Mr. White,
or at any other sum that might be named by the witnesses, it
could hardly be necessary to have expert witnesses in order
to convince the Court or the jury that taking off the part of

this front which is taken will damage the remainder. It is apparent from the plat, that what is condemned, leaves that not taken, in such an irregular shape, and so situated, that it was necessarily damaged. In our judgment it is clear that the evidence shows that the remaining lot will be considerably damaged.

Inasmuch as none of the instructions granted at the instance of the property owner directed the jury to take into consideration their view of the property in fixing the damages, or assessing benefits, and as three of those granted at the instance of the city did in terms so direct them, and inasmuch as we think there was legally sufficient evidence to go to the jury as to damages to the remaining lot, we do not feel called upon to determine whether the fact that a jury does view the property in a proceeding of this kind will require the Court to submit the question of damages *vel non* to the remaining lot, even if it thought that there was no legally sufficient evidence offered *at the trial* tending to show such damages. Section 179 of the charter is certainly very broad, as it provides for the summoning and impaneling of a jury in an appeal to the Baltimore City Court in a case of this kind "to try any question of facts, and if necessary to view any property in the city, or adjacent thereto, to ascertain and decide on the amount of damages or benefits, under the direction of the Court." When that is considered in connection with what this Court has said as to the view of the jury in condemnation cases in *Tide Water Canal Co.* v. *Archer,* 9 G. & J. 479, *Baltimore* v. *Smith and Schwartz Co.,* 80 Md. 473, and *Kurrle* v. *Baltimore,* 113 Md. 76, it cannot be doubted that some effect must be given such view by the jury. The plat used in this case helps to explain the shape of the lot left and its location with reference to what is taken, and it would be remarkable if, in determining whether the property owner will sustain damages to her remaining lot, the jury could not make any use of their view, which would show the state it will be left in, its location, etc., more satisfactorily than a plat can. If that were not so, it

would be of but little use to permit the jury to view the property. So without now determining whether the fact that a jury did view the premises would prevent the Court from taking the question of damages from the jury, if there was no legally sufficient evidence of damages actually offered in Court, the view by the jury must be given considerable effect, particularly in a case of this kind where the plat and evidence show that the lot in question will be left in a very unusual and peculiar shape and position—especially for a lot situated in what the testimony shows is one of the most desirable portions of the city for residences.

There is no inconsistency in estimating damages to the remaining lot and then in the same proceeding assessing benefits against the property owner. As was said in *Baltimore* v. *Smith & Schwartz Co., supra,* "the two transactions of fixing damages or compensation, and of assessing benefits are separate and distinct." An award which did not include compensation for the resulting injury to the remaining land would not constitute just compensation within the meaning of the Constitution, Article 3, section 40. *Ridgely* v. *Baltimore,* 119 Md. 581. As said in *Lewis on Eminent Domain,* section 473, page 610, quoted in *Ridgely* v. *Baltimore, supra,* "a statute which provides for an assessment of the *value of the land taken* will be held to include damages to the remainder as well." The entire lot on University Parkway front may be worth $10,000 and the part taken only $3,000, but by reason of taking the part, the remainder may be only worth $5,000. Clearly in such case the damages allowed should be $5,000 ($3,000 for that taken and $2,000 for the injury to the remaining lot), and as the benefits represent the enhanced value of the remaining lot as a direct result of the opening of the street, they also can be assessed. Hence, if after the street is opened the lot will be worth $6,000, instead of $5,000, the benefits are $1,000. The city's contention as to this, however, was met and rejected in *Baltimore* v. *Garrett,* 120 Md. 611, and we need not discuss it, further than to say that according to Mr. Bernard's testi-

mony, quoted above, he really estimated both damages and benefits,—although he apparently deducted the damages to the remaining lot from the assessment of benefits, and estimated the benefits at that much less than he would otherwise have done.

Further objection is made to this prayer because it was too general and indefinite as to the measure of damages, but it is evident that no prejudice could have resulted to the city for that reason. The other prayers which were granted, when taken in connection with the testimony, were sufficient to inform the jury as to what damages could be allowed, and we do not think that the verdict of the jury shows that the appellant was prejudiced by the general language of this prayer. *Baltimore* v. *Garrett, supra.*

2. The property owner's third prayer is as follows: "The Court instructs the jury that in making up their verdict as to the amount of damages to be allowed the property owner for the condemnation and taking by the Mayor and City Council of Baltimore of that portion of her lot so condemned and taken, they should take as the measure of damages the difference between the present market value of the entire lot *before taking* and the present market value of the remaining portion fronting on University Parkway *after taking,* but in ascertaining the present market value of said remaining lot, they are not to consider any value that may accrue thereto by reason of the opening of Thirty-seventh street from Charles Street avenue to University Parkway."

The city contends that this prayer was erroneous because the jury was limited to the difference between the present market value of the entire lot before taking, and the present market value of the remainder, but was not to consider any value that may accrue to the remaining lot by reason of the opening of Thirty-seventh street. The attorneys for the city rely on the cases of *Baltimore* v. *Rice,* 73 Md. 308, *Gluck* v. *Baltimore,* 81 Md. 321, *Shipley* v. *W. Md. R. R. Co.,* 99 Md. 134, *Baltimore* v. *Garrett, supra,* and *Baltimore* v. *Yost,* 121 Md. 366. They quote from the first prayer of the City

in *Baltimore* v. *Rice* that the jury could only award Rice "the fair market value of his ·interest in the brick yard in question, less the fair market value of his interest in so much thereof as will remain after the opening of Clare street." The Court was then dealing only with the interest of a tenant in a brick yard, spoken of in a prayer granted at his instance as a tenant from year to year, although JUDGE BRYAN said he was not in all respects technically such. When a tenant occupied such a property as that, and a street was to be run through it, that rule of damages would perhaps be as accurate as could well be fixed. Rice testified that the brick yard was worth $4,000 and after the street went through, it would be worth nothing. The jury assessed the damages at $3,500. But there was no question of benefits in that case, as there is in this. If the jury in assessing damages had taken into consideration any value that may accrue to the remaining portion of the property by reason of the opening of Thirty-seventh street, and including that in the deduction of the market value, and then assessed such benefits as the property will receive from the proposed condemning and opening of that street, unquestionably the property owner would be paying double benefits—once by having them deduct it from the damages he received, and then by having them separately charged in the assessment for benefits. That is certainly not the correct rule, in a case like this, and none of the cases cited have so announced it; so in *Gluck's case,* he simply had a leasehold estate and no benefits were assessed. We do not find anything in the other cases cited that should cause us to hold this prayer to be erroneous. In cases of this character, there are often circumstances peculiar to the respective cases, and it would be extremely difficult to announce a rule for assessing damages that would be applicable to all of them.

3. We can see no valid objection to the fourth prayer. We do not understand the fifth to be objected to.

4. The sixth is as follows: "The Court instructs the jury that in making up their verdict as to benefits to be assessed to the property owner, the only matter for their inquiry is the

amount of increase in the actual market value of the remainder of the lot on University Parkway not taken, which will be caused by the acquisition through these proceedings by the Mayor and City Council of Baltimore, of title to her land condemned and taken by the city in and for the opening of Thirty-seventh street from Charles Street avenue to University Parkway, and their verdict as to benefits should be limited to such increase, if any there be, and they cannot inquire into or take into consideration the amount allowed by the Commissioners for Opening Streets, or the amount that they, the jury, may allow the property owner as damages for the land so condemned, and taken by the city."

The principal objection urged against this prayer is that it limits the benefits to the amount of increase in the actual market value of the remainder of the lot on University Parkway not taken, which will be caused by the acquisition through these proceedings "of title to *her* land condemned and taken by the city." It is, of course, conceded by the appellees that the benefits are measured by the enhanced value of the remaining portion of the lot, which is due to the *entire* improvement, and not simply to the property owner's land taken. It seems almost incredible that a jury could have been misled by that, after being engaged in the trial for a week. The questions propounded to the three witnesses examined as to benefits showed clearly that they were asked about the benefits as the result of these proceedings for taking *all* of the lots between Charles street and University Parkway. The question to Mr. Bernard, for example, specifically mentioned all the ground marked "A," "B," "C," "D" and "E" on the plat,—which are the several lots included in the condemnation,—and the other two witnesses were also referred to the plat, which was before the jury. The use of the word "the" instead "her" would in our judgment have made this prayer unobjectionable. The appellees' fifth, seventh and eighth prayers referred to the benefits as the enhanced value of the remaining lot as the result of the opening of Thirty-seventh street from Charles street to University Park-

the same way. In the argument of the case in the lower
Court, if there had been any comment on the use of the word
way, and the appellant's fifth prayer also referred to it in
"her", surely the Court or the attorney for the city would
have noticed it. It would bring discredit upon the admin-
istration of justice to reverse a case because the word "her"
was, apparently unintentionally, substituted for "the", as
we must assume was the fact. The prayer is in other respects
substantially similar to that granted and approved in *Balti-
more* v. *Smith and Schwartz Co.* Of course we are aware of
what this Court has said about conflicting prayers, and those
in which something has been omitted which ought to have
been inserted, but we are satisfied that when the granted
prayers in this case are taken together there is no real con-
flict, and no jury composed of men of ordinary intelligence
could have been misled as to the instructions intended to be
given them.

We do not think that the fact that the amount of benefits
by the Commissioners for the Opening of Streets was re-
duced from $1,269.90 to $800 could have been attributable
to that error in the prayer. The jury had viewed the prop-
erty and had the plat before them. They were not bound to
accept the estimates of the witnesses for the city as to the
benefits. One of them was asked: "Are there not some rules
by which you ascertain the amount of benefits to be assessed
against the property," and he replied, "Absolutely no. It
is a matter of judgment. There is no rule. Property differs
in every section of the city and there is therefore absolutely
no rule by which you can tell." That was a frank and evi-
dently true answer, and in this case one witness reached his
valuation by assessing $10. per foot for the 150 feet on the
curved line between the property taken and the remaining
lot. The plat shows that for at least one-third of that line
there would not be a depth from Thirty-seventh street of over
thirty feet at the deepest point, and running from that to
nothing. While another witness made his estimate by allow-
ing $15 a front foot on University Parkway, being $1,269.90;

and still another estimated the benefits at $1,800—being the difference between what he thought the lot was worth now and what it would be worth when the street is opened. When expert witnesses differ so much as to amounts and the methods of determining them, juries cannot be expected to be entirely controlled by their evidence—especially in cases in which they have viewed the premises themselves.

The theory of the appellant that the expression in reference to the acquisition of the *title* to the land taken by the city excluded any consideration of the use of the land for street purposes we cannot adopt. The land was acquired through these proceedings for street purposes, and surely no jury in Baltimore City would be so ignorant as to suppose that any benefits which could be assessed must accrue to the remaining lot simply because the city acquired title to the land. That expression is used in the prayer in the *Smith and Schwartz Co. case.*

There is no inconsistency between this prayer and the city's fifth, if the word "her" is read "the", as was evidently intended.

5. There is no reversible error in the 7th prayer. It is peculiarly expressed, but not altogether unlike prayers granted in *Friedenwald* v. *Baltimore,* 74 Md. 116, and the *Smith and Schwartz case, supra.* We do not understand that the other prayers are objected to. Being of the opinion that the prayers when taken together properly presented the law applicable to the case we will affirm the rulings of the lower Court.

*Rulings affirmed, the appellant to pay the costs.*